STATE of Alaska, acting By and Through its DEPARTMENTS OF TRANSPORTATION AND LABOR, and Alaska Industrial Developmental Authority, Appellant,

v.

ENSERCH ALASKA CONSTRUCTION, INC., Ralph C. LaRose, Jr.; Kenneth C. Opel; Nana Regional Corporation, Inc.; Daniel Harvey; Melvin Morena; and Northwest Arctic Borough, a Home Rule Municipality, Appellees.

NANA REGIONAL CORPORATION, INC., Daniel Harvey, and Melvin Morena, Appellants,

v.

STATE of Alaska, acting By and Through its DEPARTMENTS OF TRANSPORTATION AND LABOR, and Alaska Industrial Developmental Authority; Enserch Alaska Construction, Inc.; Ralph C. LaRose, Jr.; Kenneth L. Opel; and Northwest Arctic Borough, a Home Rule Municipality, Appellees.

ENSERCH ALASKA CONSTRUCTION, INC., Cross/Appellants,

v.

STATE of Alaska, acting By and Through its DEPARTMENTS OF TRANSPORTATION AND LABOR, and The Alaska Industrial Developmental Authority; Nana Regional Corporation, Inc.; Daniel Harvey; Melvin Morena; Northwest Arctic Borough, a Home Rule Municipality; Ralph C. LaRose, Jr.; and Kenneth L. Opel, Cross/Appellees.

NORTHWEST ARCTIC BOROUGH, a Home Rule Municipality, Appellant,

v.

ENSERCH ALASKA CONSTRUCTION, INC.; Ralph C. LaRose, Jr.; Kenneth C. Opel; State of Alaska, acting By and Through its Departments of Transportation and Labor, and Alaska Industrial Developmental Authority; Nana Regional Corporation, Inc.; Daniel Harvey; and Melvin Morena, Appellees.

Nos. S–2693, S–2694, S–2731 and S–2736.

Supreme Court of Alaska.

Dec. 18, 1989.

Rehearing Denied Feb. 20, 1990.

Jan Hart DeYoung, Asst. Atty. Gen., Anchorage, and Grace Berg Schaible, Atty. Gen., Juneau, for State of Alaska.

J.W. Sedwick, Burr, Pease & Kurtz, Anchorage, for Enserch Alaska Const., Inc., Ralph C. LaRose, Jr. and Kenneth L. Opel.

Robert M. Johnson, James R. Szender, Wohlforth, Argetsinger, Johnson & Brecht, Anchorage, for NANA Regional Corp., Inc., Daniel Harvey and Melvin Morena.

Richard H. Erlich, Kotzebue, for Northwest Arctic Borough.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

This appeal involves the constitutionality of AS 36.10.160 which provides a hiring preference to residents of economically distressed zones for certain employment on public works projects. The superior court, Judge Douglas J. Serdahely, declared the law unconstitutional under Alaska's equal protection clause. We affirm the superior court's decision on the unconstitutionality of the regional preference law and its rulings concerning waiver, intervention, and standing. We reverse the superior court's ruling on the right to seek damages for the state's enforcement of the unconstitutional law.

## I. FACTS

In January 1986, we held that the state's local hire law, AS 36.10.010, violated the privileges and immunities clause of article IV, section 2 of the United States Constitution. *Robison v. Francis*, 713 P.2d 259 (Alaska 1986). In May 1986, the Legislature enacted a new statute creating four hiring preferences on public works

projects.[1] The first is a preference for eligible individuals residing within a zone of underemployment. AS 36.10.150. The second is a preference for eligible residents of an economically distressed zone. AS 36.10.160. This is the preference at issue in this appeal. The third is a preference for eligible economically disadvantaged minority residents of a zone. AS 36.10.170. The fourth is for eligible economically disadvantaged female residents of a zone. AS 36.10.175.

These employment preferences are not self-executing. To trigger application of the employment preference provisions, the Commissioner of the Department of Labor ("the Commissioner") must determine that a zone is economically distressed. AS 36.-10.160(a).[2] An economically distressed zone is an area in which: (1) zone residents have per capita income less than 90 percent of the United States per capita income, or zone unemployment exceeds national unemployment by at least five percent; (2) the lack of employment opportunities substantially contributes to social or economic problems; and (3) employment of nonresident workers is a peculiar source of unemployment for resident workers.[3]

In 1987, the state and Enserch Alaska Construction, Inc. ("Enserch") entered into a contract for the construction of a fifty-five mile road from the Bering Sea coast to the proposed Red Dog Mine in the Northwest Arctic Borough ("the Borough").[4] The contract required Enserch to "comply with all applicable laws and regulations regarding the hiring of Alaska residents now in effect or that may subsequently take effect...."

1. AS 36.10.150–.180. AS 36.10.180 sets forth the projects subject to preference:
(a) The preferences established in AS 36.10.-150–36.10.175 apply to work performed
(1) under a contract for construction, repair, preliminary surveys, engineering studies, consulting, maintenance work, or any other retention of services necessary to complete a given project that is let by the state or an agency of the state, a department, office, state board, commission, public corporation, or other organizational unit of or created under the executive, legislative or judicial branch of state government, including the University of Alaska and the Alaska Railroad Corporation, or by a political subdivision of the state including a regional school board with respect to an educational facility under AS 14.11.020:
(2) on a public works project under a grant to a municipality under AS 37.05.315;
(3) on a public works project under grant to be named recipient under AS 37.05.316;
(4) on a public works project under a grant to an unincorporated community under AS 37.05.317; and
(5) on any other public works project or construction project that is funded in whole or in part by state money.

2. AS 36.10.160(a) provides:
Immediately following a determination by the commissioner that an economically distressed zone exists, and for the next two fiscal years after the determination, qualified residents of the zone who are eligible under AS 36.10.140 shall be given preference in hiring for at least 50 percent of employment on each project under AS 36.10.180 that is wholly or partially sited within the zone. The preference applies on a craft-by-craft or occupational basis.

3. AS 36.10.160(b). AS 36.10.160(b) provides:
The commissioner shall determine that an economically distressed zone exists if the commissioner finds that
(1) the per capita income of residents of the zone is less than 90 percent of the per capita income of the United States as a whole, or the unemployment rate in the zone exceeds the national rate of unemployment by at least five percentage points;
(2) the lack of employment opportunities in the zone has substantially contributed to serious social or economic problems in the zone; and
(3) employment of workers who are not residents is a peculiar source of unemployment of residents of the zone.
The employment of nonresidents is a "peculiar source of unemployment" in an area when "more than 10 percent of the residents of an area who are trained or experienced in a craft or occupation are unemployed and more than 10 percent of the total number of workers employed in that area in that craft or occupation are not residents of the area." 8 AAC 30.069.

4. The Red Dog Mine is a private venture to extract zinc and lead from the DeLong Mountains. A transportation corridor, including a road and a harbor facility, had to be developed to extract and transport the ore. Recognizing both the lack of private capital and the project's anticipated economic benefit to the region, the Alaska Legislature appropriated $132,000,000 in loans and $12,000,000 in cash to enable the Alaska Industrial Development and Export Authority (AIDA) to secure bonds to finance this transportation corridor. Ch. 67, SLA 1985.

When Enserch started work on the project, the Commissioner had not yet designated any area of the state as an economically distressed zone. However, in 1987, the Borough asked the Commissioner to declare the Borough an economically distressed zone. The Department of Labor ("DOL") gathered the information necessary to evaluate whether the Borough was eligible for such a designation. After reviewing this information, the Commissioner issued emergency regulations declaring the Borough an economically distressed zone.[5]

As a result of the Borough's designation as an economically distressed zone, the road project was subject to the employment preference provisions. AS 36.10.160. Thus, Enserch was required to fill at least fifty percent of the positions available in certain designated crafts [6] with eligible, qualified Borough residents. After implementation of the preference, employment of the Borough residents on the project increased from fifteen percent to forty-two percent.

## II. PROCEEDINGS

In November 1987, Enserch filed suit against the state seeking (1) a declaration that AS 36.10.160 violated state and federal equal protection guarantees and the federal privileges and immunities clause, and (2) damages for its increased costs in complying with the law. In December 1987, Enserch moved for partial summary judgment.

The superior court permitted the Borough, NANA Regional Corporation, Inc. ("NANA"), Daniel Harvey, and Melvin Morena to intervene as defendants. The court also allowed Kenneth L. Opel and Ralph C. LaRose, Jr. to intervene as plaintiffs. Enserch moved for partial summary judgment that the employment preference deprived it of equal protection of the laws and the privileges and immunities of national citizenship. The state cross-moved for summary judgment on the ground that Enserch expressly had waived its right to recover damages. NANA moved to dismiss the complaint on the grounds of standing, ripeness, waiver of Enserch's right to challenge the constitutionality of the law, and failure to state a claim upon which relief may be granted.

The superior court entered partial summary judgment for Enserch. The court held that Enserch did not waive its right to challenge the constitutionality of the regional preference law. The court held that Opel, LaRose, and Enserch had citizen-taxpayer standing to challenge the preference law on equal protection grounds; however, they lacked standing to assert a federal privileges and immunities challenge.[7] The court then concluded that the preference law violated the equal protection provision of the Alaska Constitution. Finally, the court ruled that the state was not entitled to summary judgment on the issue whether Enserch waived its right to seek damages for the state's enforcement of the law be-

5. In support of this determination, the Commissioner found that: (1) the Borough had a 12–month unemployment rate of 15.7 percent compared to the national 12–month average of 6.9 percent; (2) lack of employment in the Borough had substantially contributed to its economic and social problems; and (3) more than 10 percent of the qualified or trained resident workers in 12 different crafts were unemployed while more than 10 percent of those employed in the Borough in the 12 crafts were not Borough residents.

6. The Commissioner's findings covered the following crafts or occupations:

Airline Pilots and Navigators
Carpenters
Construction Laborers
Construction Managers

Electricians and Power Transmission Installers
Equipment Operators
Plumbers, Pipefitters and Steamfitters
Receptionists
Survey Crews
Truck Drivers
Vehicle and Mobile Equipment Mechanics and Repairers
Welders and Cutters

Enserch only was required to hire qualified local residents. AS 36.10.070(b). If qualified local residents are not available, DOL may grant a waiver to allow nonresidents to be hired. *Id.* In this case, DOL processed 14 waiver requests covering 47 employees. DOL granted waivers for 43 employees and denied four.

7. Enserch did not appeal the privileges and immunities ruling.

cause evidence in the record presented genuine issues of material fact. The court entered partial final judgment pursuant to Civil Rule 54(b).

The state and NANA appeal. They argue that: (1) Enserch waived its right to challenge the constitutionality of the regional preference law; (2) the superior court abused its discretion in permitting LaRose and Opel to intervene as plaintiffs; (3) Enserch, LaRose, and Opel lack standing to raise an equal protection challenge; (4) the regional preference law does not deny equal protection; and (5) Enserch waived its right to recover damages for the state's enforcement of the law. The Borough appealed, arguing that AS 36.10.160 is constitutional. Enserch cross-appealed, arguing that it had not waived its right to recover damages as a matter of law.

## III. WAIVER

■ As a threshold matter, the state and NANA argue that the superior court erred in concluding that Enserch did not waive its right to challenge the constitutionality of AS 36.10.160. Enserch contends that, as a matter of law, it did not waive its right to challenge the law.

The state relies on Section 17 of its contract with Enserch which provides in part, "The Contractor shall comply with all applicable laws and regulations regarding the hiring of Alaska residents now in effect or that may subsequently take effect during the term of this contract." Enserch argues that the contract provision only applies to constitutional laws. It asserts that the state's enforcement of a condition requiring compliance with an unconstitutional law would constitute a breach of the implied covenant of good faith and fair dealing. Thus, Enserch concludes that it was entitled to summary judgment because the provision is unenforceable as a matter of law.

We conclude that Enserch did not waive its right to challenge the constitutionality of the regional preference law. The superior court correctly held that Enserch could maintain its action for declaratory relief. In *Salla v. County of Monroe*, 64 A.D.2d 437, 409 N.Y.S.2d 903 (1978), *aff'd*, 48 N.Y.2d 514, 423 N.Y.S.2d 878, 399 N.E.2d 909 (1979), *cert. denied*, 446 U.S. 909, 100 S.Ct. 1836, 64 L.Ed.2d 262 (1980), a contractor accepted a county contract which required compliance with all local and state laws, including local hire provisions. 409 N.Y.S.2d at 905. The contractor sued the state, seeking a declaration that a local hire law violated the state constitution. The court held that a "public contract should not be conditioned on a waiver of constitutional rights." 409 N.Y.S.2d at 907. In a similar case, a New York appellate court explained:

> The fact that the petitioner has signed contracts with the Department which set forth the debarment policy [for failure to comply with state affirmative action programs] should not work a waiver of petitioner's right to challenge the Department's authority to establish such a policy. Otherwise, an agency could create by contract authority ... which has not been delegated by the Legislature.

*Callahan Industries, Inc. v. White*, 118 A.D.2d 167, 503 N.Y.S.2d 930, 933 n. * (1986) (citations omitted).

As a matter of public policy, we conclude that a provision in a public contract requiring compliance with state laws does not prevent the contractor from challenging the law as unconstitutional. As we noted in *Lynden Transport, Inc. v. State*, 532 P.2d 700, 717 (Alaska 1975), "[a]lthough most constitutional rights are subject to waiver, they must be knowingly and voluntarily waived. In civil cases (no less than in criminal), the courts must indulge every reasonable presumption against their waiver."

Enserch did not explicitly waive its right to challenge the constitutionality of the regional preference law. The contract only required compliance "with all applicable laws and regulations regarding the hire of Alaska residents now in effect or that may subsequently take effect...." Enserch's promise to comply with the regional preference law and its implementing regulations is not a promise to refrain from challenging its constitutionality. Accordingly, we

conclude that the superior court was correct in ruling that Enserch did not waive its right to challenge the constitutionality of the regional preference law or its implementing regulations.

## IV. INTERVENTION BY OPEL AND LaROSE

■ The State and NANA argue that the superior court abused its discretion in allowing Opel and LaRose to intervene in this action because their motion was filed six days before the scheduled motions for summary judgment. Enserch contends that the court acted within its discretion by permitting intervention and continuing oral argument for a week. The grant or denial of a motion for permissive intervention is subject to review for abuse of discretion. *State v. Weidner*, 684 P.2d 103, 113 (Alaska 1984).

Anyone may intervene in an action when the applicant has a claim sharing common questions of law or fact with the main action. Alaska R.Civ.P. 24(b).[8] In addition, the motion to intervene must be timely and should not unduly delay or prejudice the adjudication of the rights of the original parties. *Id.*

■ The state concedes that Opel and LaRose raise the same constitutional issues asserted by Enserch. However, the state and NANA contend that they were unduly prejudiced by Opel and LaRose's late intervention and the superior court's refusal to extend time for discovery on the intervenors' claims beyond the seven days granted. We first note that Opel and LaRose did not raise any issues not already raised by Enserch. Second, the state and NANA were able to depose the intervenors before argument on the summary judgment motion. In light of these facts, we conclude that the superior court did not abuse its discretion by permitting Opel and LaRose to intervene.

**8.** Civil Rule 24(b) provides:
(b) *Permissive Intervention.* Upon timely application anyone may be permitted a intervene in an action when an applicant's claim or defense and the main action have a ques-

## V. STANDING

The state and NANA argue that Opel, LaRose, and Enserch lack standing to assert the equal protection claim. The superior court ruled that Opel, LaRose, and Enserch had citizen-taxpayer standing to challenge the regional preference law on equal protection grounds.

■ "Standing in our state courts is not a constitutional doctrine; rather, it is a rule of judicial self-restraint based on the principle that courts should not resolve abstract questions or issue advisory opinions." The "concept of standing has been interpreted broadly in Alaska." *Trustees for Alaska v. State*, 736 P.2d 324, 327 (Alaska 1987).

Citizen-taxpayer standing cannot be claimed as a matter of right when challenging government conduct. 736 P.2d at 329. Instead, the party asserting citizen-taxpayer standing must meet the following criteria:

First, the case in question must be one of public significance. One measure of significance may be that specific constitutional limitations are at issue.... Second, the plaintiff must be appropriate in several aspects. For example, standing may be denied if there is a plaintiff more directly affected by the challenged conduct in question who has or is likely to bring suit. The same is true if there is no true adversity of interest, such as a sham plaintiff whose intent is to lose the lawsuit and thus create judicial precedent upholding the challenged action. Further, standing may be denied if the plaintiff appears to be incapable, for economic or other reasons, of competently advocating the position it has asserted.

736 P.2d at 329–30 (footnotes omitted).

■ Opel and LaRose are construction workers who do not reside in the Borough. Opel is a resident of Anchorage and a heavy equipment operator. He was employed by Enserch on the road project dur-

tion of law or fact in common.... In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

ing the fall of 1987 until the project shut down for the winter. He asserts that because of the regional preference law it is uncertain whether he will be rehired by Enserch in the spring.

LaRose is an electrician and a resident of Fairbanks who was turned away from the job site the day that Enserch received notice of the emergency order implementing the employment preferences. Several weeks later, LaRose was hired to work on the project. He claims that he lost at least five weeks of wages because of the preference.

We agree with the superior court that LaRose and Opel have citizen-taxpayer standing to challenge the preference under the Alaska equal protection clause. Initially, we note that the constitutionality of the regional preference law is clearly a question of public significance. As we noted in *Trustees*, one measure of significance is that a specific constitutional limitation is at issue. Here Opel and LaRose argue that the regional preference law violates the specific guarantee of "equal opportunity" for all Alaskans found in article I, section 1 of the Alaska Constitution.

Second, we believe that both individuals are appropriate parties to bring this suit. Opel and LaRose are construction workers who have earned their livelihood in part from working on public works projects. Each intends to continue his employment with Enserch but is concerned that the resident hiring preferences may deny him an opportunity to do so. As a result, there is no doubt that Opel and LaRose meet the basic requirement of adversity necessary for standing. *See Trustees*, 736 P.2d at 327. They are not sham plaintiffs; no one

has questioned the sincerity of their belief that the regional preference law is unconstitutional. They are represented by competent counsel who have forcefully presented their position. Nor do we believe that there are other persons more directly affected who have or are likely to bring suit. Consequently, we affirm the superior court on the issue of Opel and LaRose's standing to challenge the regional preference law under the Alaska Constitution.

■ The state and NANA contend that Enserch lacks standing since it cannot assert the constitutional rights of a third party such as an applicant denied employment due to the employment preference law.[9] We need not reach the question of third party standing because we believe that Enserch itself possesses a sufficient interest to confer interest-injury standing.

Interest-injury standing requires "an interest adversely affected by the conduct complained of." *Trustees*, 736 P.2d at 327. As we noted in *Trustees:*

Such an interest may be economic, or it may be intangible, such as an aesthetic or environmental interest. The degree of injury to the interest need not be great; "[t]he basic idea ... is that an identifiable trifle is enough for standing to fight out a matter of principle; the trifle is the basis for standing and the principle supplies the motivation."

*Id.* (citations omitted).

Enserch alleges that the enforcement of the preference law caused it economic injury of $1,000,000. Because Enserch alleges injury from the state's enforcement of an unconstitutional law, we conclude that Enserch satisfies the basic requirement of adversity for standing in our state courts.

---

**9.** Generally, a litigant lacks standing to assert the constitutional rights of another. *Falcon v. Alaska Pub. Officers Comm'n*, 570 P.2d 469, 475 n. 20 (Alaska 1977); *see Wagstaff v. Superior Court*, 535 P.2d 1220, 1225 (Alaska 1975). A corporation can only assert its own rights and not the rights of its employees. *Virginian Ry. v. System Fed'n No. 40*, 300 U.S. 515, 558, 57 S.Ct. 592, 604, 81 L.Ed. 789 (1937).

Exceptions to the general rule exist. For example, we have allowed third party standing where a special relationship exists between the plaintiff and the third party. *See, e.g., Bonjour*

*v. Bonjour*, 592 P.2d 1233, 1241 n. 15 (Alaska 1979) (parent has standing to assert child's constitutional rights). Moreover, standing may be conferred on a third party when the interested party's attempt to vindicate his rights would forfeit these very rights. *Falcon*, 570 P.2d at 475. The United States Supreme Court has allowed a third party to assert an interested party's equal protection claims when the interested party is unable to assert his own rights. *Barrows v. Jackson*, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953).

We fail to see a valid justification for denying Enserch standing to challenge the preference law simply because the law's alleged constitutional infirmity involves discrimination between Alaska employees.

## VI. EQUAL PROTECTION

The state argues that the superior court erred in entering summary judgment because (1) the evidence presents genuine issues of material fact, and (2) as a matter of law, the regional preference law does not violate the equal protection clause.

Enserch accepted for purposes of its summary judgment motion the defendants' statement of facts. The superior court concluded that the development of a factual record with respect to the equal protection claim was unnecessary insofar as the analysis of such claim was essentially legal rather than factual in nature. The state and NANA have failed to present in their arguments on appeal any disputed issues of material fact which preclude summary judgment.[10]

We conclude that the record before us provides ample evidence of the legislature's justifications for adopting the regional preference law as well as the economic and sociological data supporting the Commissioner's findings as to the conditions in the Borough. In addition, the State and Enserch have supplemented the record on appeal with subsequent DOL preference determinations and reports concerning the economic effects of non-residents working in Alaska. We conclude that the superior court did not err in finding that no genuine issues of material fact were in dispute and that an evidentiary hearing was not necessary in order to resolve the equal protection claim.

Article I, section 1 of the Alaska Constitution provides in part that "all persons are equal and entitled to equal rights, opportunities, and protection under the law." We have interpreted the language of article I, section 1 to require analysis using a sliding scale approach instead of the tiered approach of federal equal protection analysis. *State v. Erickson*, 574 P.2d 1, 12 (Alaska 1978). We refined this approach in *State v. Ostrosky*, 667 P.2d 1184, 1192–93 (Alaska 1983) and *Alaska Pacific Assurance Co. v. Brown*, 687 P.2d 264, 269–70 (Alaska 1984). In applying the sliding scale analysis, we have noted on a number of occasions that our state constitution often provides greater protection to individual rights than does the U.S. Constitution.[11]

Under *Brown*, we first determine the importance of the individual interest impaired by the challenged enactment. We then examine the importance of the state interest underlying the enactment, that is, the purpose of the enactment. Depending upon the importance of the individual interest, the equal protection clause requires that the state's interest fall somewhere on a continuum from mere legitimacy to a compelling interest. Finally, we examine the nexus between the state interest and the state's means of furthering that interest. Again depending upon the importance of the individual interest, the equal protection clause requires that the nexus fall somewhere on a continuum from substan-

---

**10.** Instead, the state and NANA rely on the United States Supreme Court's opinion in *United Building and Construction Trades Council v. Mayor and Council of Camden,* 465 U.S. 208, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984), for the proposition that an evidentiary hearing or trial should be held before Enserch's equal protection claim can be adjudicated. We note that the procedural posture of the *Camden* case was very different from this case, and therefore find it unpersuasive as support for a remand in this case. In *Camden,* the Supreme Court concluded that it could not evaluate the plaintiff's federal privileges and immunities challenge to the Camden municipal ordinance on the record before it since the case had been decided by the New Jersey Supreme Court on "direct appeal after the brief administrative proceedings that led to approval of the ordinance by the State Treasurer." 465 U.S. at 223. Thus, the U.S. Supreme Court concluded that "[i]t would not be appropriate for the Court either to make factual determinations as an initial matter or to take judicial notice of Camden's decay." *Id.*

**11.** *See, e.g., Patrick v. Lynden Transp., Inc.,* 765 P.2d 1375, 1377 (Alaska 1988); *Schafer v. Vest,* 680 P.2d 1169, 1172 (Alaska 1984) (Burke, C.J., concurring); *Commercial Fisheries Entry Commission v. Apokedak,* 606 P.2d 1255, 1267 (Alaska 1980).

tial relationship[12] to least restrictive means. 687 P.2d at 269–70. The equal protection clause thus requires that all enactments be substantially related to a legitimate state interest. Some enactments are held to higher standards, and may even need to be the least restrictive means of achieving a compelling state interest.

We first examine the nature of the interest impaired by the regional preference law. Enserch argues that the right to seek and obtain gainful employment in one's craft is a very important one. The Borough responds that, while the general "right to work" may be important, the right to work on a public job in a particular craft in a particular location is much less critical. Similarly, the state argues that we should consider the degree to which a law impairs the right at issue before assigning the right a weight. *See Brown*, 687 P.2d at 271 (impairments of the right to travel). Because the preference applies to only 50 percent of certain craft positions on a public works project in a particular area, the State argues for the application of a low level of scrutiny.

Our cases have acknowledged the importance of the opportunity to work. For purposes of the federal privileges and immunities clause, the right to pursue a living in a particular line of work is a fundamental right. *Sheley v. Alaska Bar Association*, 620 P.2d 640, 643 (Alaska 1980). As we observed in *Robison v. Francis*, 713 P.2d 259, 265 (Alaska 1986), "employment in the construction industry must be considered a fundamental right entitled to the protection of the privileges and immunities clause." [13]

While the right to earn a living is not a fundamental right under the federal equal protection clause, *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976), we have noted that the right to engage in an economic endeavor within a particular industry is an "important" right for state equal protection purposes. *Commercial Fisheries Entry Comm'n v. Apokedak*, 606 P.2d 1255, 1266 (Alaska 1980).

At issue in *Apokedak* was whether the Limited Entry Act restricting commercial fishing in Alaskan waters was consistent with the equal protection clause of the Alaska Constitution. The Limited Entry Act barred commercial fishing in Alaska fisheries without an entry permit. Entry permits only could be obtained from the state if the applicant held a gear license before January 1, 1973. In *Apokedak*, as

12. In stating this minimum level of scrutiny of the nexus between the state's interest in the enactment and the state's chosen means, we have sometimes suggested that the classification must be "reasonable, not arbitrary" and rest "upon some ground of difference having a fair and substantial relation to the object of the legislation." *Patrick v. Lynden Transp., Inc.*, 765 P.2d 1375, 1377 (Alaska 1988); *Herrick's Aero-Auto-Aqua Repair Service v. State, Dept. of Transp.*, 754 P.2d 1111, 1114 (Alaska 1988); *State v. Ostrosky*, 667 P.2d 1184, 1193 (Alaska 1983). This language comes originally from *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 561–62, 64 L.Ed. 989 (1920) and was subsequently quoted in our decisions in *State v. Wylie*, 516 P.2d 142, 145 (Alaska 1973) and *Isakson v. Rickey*, 550 P.2d 359, 362 (Alaska 1976). The requirement that the classification be reasonable and not arbitrary predates our *Erickson* sliding scale analysis. Since it is a requirement imposed upon the state's chosen means rather than the state's interest or the nexus between the state's interest and the means, the imposition of this requirement is a fourth level of equal protection analysis not required by our opinion in *Brown*. This requirement need not be part of our equal protec-

tion analysis because due process already requires that enactments be reasonable and not arbitrary. *Concerned Citizens of South Kenai Peninsula v. Kenai Peninsula Borough*, 527 P.2d 447, 452 (Alaska 1974); *Mobile Oil Corp. v. Local Boundary Comm'n*, 518 P.2d 92, 101 (Alaska 1974). If an enactment requiring only the minimum level of scrutiny could ever be substantially related to a legitimate state interest and still be unreasonable or arbitrary, we would find that it denied due process, not equal protection.

13. The local preference law here like the state preference law at issue in *Robison* is subject to the federal privileges and immunities clause. *United Bldg. and Constr. Trades Council v. Mayor and Council of Camden*, 465 U.S. 208, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984) (local hire preference law for city public works projects is subject to scrutiny under the privileges and immunities clause even though it discriminated against state residents as well). The superior court ruled that the plaintiffs in this action being Alaska residents and an Alaska corporation are not protected in this case by the federal privileges and immunities clause. Enserch did not appeal this ruling.

here, the right in question was the right to work in a particular industry.

The state argues that the regional preference law is entitled to greater deference because it applies only to certain crafts in state construction projects in certain areas. However, that the local hire law is limited to public works construction projects does not significantly reduce its impact since "public works account for the majority of commercial construction activity in Alaska."[14] By restricting the number of public works construction jobs available to non-zone residents, the regional preference law will impose significant limitations on construction workers' overall employment opportunities. The unemployed electrician from Bethel and the unemployed heavy equipment operator from Dillingham seeking a job on the Enserch project will find little solace in the fact that other occupations or private jobs are not covered by the preference.

We acknowledge that the resident preference applies to at least fifty percent of the positions available in a particular craft. Thus, we are not necessarily confronted with a total deprivation of employment op-

portunities for nonresidents of a zone.[15] However, we also were not faced with a total deprivation of employment in *Apokedak* where we announced that the right to engage in economic endeavor is an important one. In *Apokedak*, we noted that while those without gear licenses "are deprived of some opportunities of changing their status in the fishing industry ... they may secure an entry permit through transfer, purchase or inheritance." 606 P.2d at 1266. Therefore, that the restriction on employment opportunities may not be total does not diminish the importance of the right asserted.[16]

█ We conclude that the right affected by the regional preference law is an important one. Therefore, we will closely scrutinize the law. *Patrick v. Lynden Trans., Inc.*, 765 P.2d 1375, 1379 (Alaska 1988). Close scrutiny of enactments impairing the important right to engage in economic endeavor requires that the state's interest underlying the enactment by not only legitimate, but important, and that the nexus between the enactment and the important interest it serves be close.[17]

---

**14.** *Robison,* 713 P.2d at 262. Even in good economic times, public construction "accounts for approximately sixty to seventy percent or more of the total construction dollar outlay within the state." *Id.*

**15.** *See Robison,* 713 P.2d 259 (Alaska 1986) (all positions on state public works projects closed to non-resident workers); *Gilman v. Martin,* 662 P.2d 120, 125 (Alaska 1983) (non-borough residents prohibited from participating in borough land lottery); *Sheley v. State Bar Ass'n,* 620 P.2d 640 (Alaska 1980) (30–day residency requirement for bar admission).

**16.** The impact of the 50 percent preference is compounded by the cumulative effect of other preferences which also might apply in a particular zone. For example, the preference for economically disadvantaged minority residents in AS 36.10.170 provides for a preference of the greater of 25 percent or a percentage representative of the civilian minority residents in a zone. Consequently, in some zones the economically disadvantaged minority preference is as high as 80 percent. *See* Resident Hire Preference Determination, June 20, 1988 at 58, 62.

The law is not saved by the Commissioner's power to waive a preference when eligible zone residents are unavailable. AS 36.10.070. First,

there is no guarantee that the Commissioner will grant a waiver for a particular position. Moreover, in situations where qualified residents are available, these waivers are of no value to non-resident unemployed workers.

**17.** In *Apokedak,* we noted that "[b]ased on the nature of the right, a greater or lesser burden is placed on the state to show that the classification has a fair and substantial relation to a legitimate governmental objective." 606 P.2d at 1264. This was a correct statement of the rule we announced in *Erickson,* 574 P.2d at 12. However, this formulation led us to require that an enactment impairing an important right bear only a fair and substantial relationship to the state's interest in the enactment. *Apokedak,* 606 P.2d at 1266. This result is at odds with our holding in *Brown,* 687 P.2d at 269–70, that the nexus between an enactment and the state's interest must be more than merely substantial when more important rights are impaired. We now state the proper inquiry for enactments impairing rights as important as the right to engage in economic endeavor. We do not question the fundamental nature of our state equal protection analysis: it remains a single, flexible test and not a rigid, tiered approach like that employed in interpreting the equal protection clause of the U.S. Constitution. Enactments impairing rights more or less important than the

■ We next turn to an examination of the state's interest in adopting the regional preference law.[18] The State, NANA, and the Borough argue that the preference in AS 36.10.160 has a number of important goals. We agree. The legislative findings explain that the act was enacted to "reduce unemployment among residents of the state, remedy social harms resulting from chronic unemployment, and assist economically disadvantaged residents." Ch. 33, § 1, SLA 1986. Thus, the statute represents an attempt to preserve the social structure in an economically distressed zone by providing employment opportunities for qualified workers on state-funded construction projects there.

While these goals are important, they conceal the underlying objective of economically assisting one class over another. We have held that this objective is illegitimate. In *Lynden Transport, Inc. v. State*, 532 P.2d 700, 710 (Alaska 1975), we ruled that "discrimination between residents and nonresidents based solely on the object of assisting the one class over the other economically cannot be upheld under ... the ... equal protection clause[ ]." While that case involved discrimination between state residents and nonresidents, the principle is equally applicable to discrimination among state residents. We conclude that the disparate treatment of unemployed workers in one region in order to confer an economic benefit on similarly-situated workers in another region is not a legitimate legislative goal.[19]

This conclusion essentially ends our inquiry. That the legislature also hoped to preserve the social structure of economically distressed areas cannot be viewed as a purpose separate from that of aiding the residents of such areas. It would not make sense to conclude that a statute may not discriminate between residents of two areas in order to aid the residents of the more disadvantaged area, but that such a statute could discriminate between residents of two areas in order to aid the communities in the more disadvantaged area. The communities are merely the collective sum of the residents. Our constitution guarantees the rights of "persons," [20] not communities viewed separately from the people who constitute the communities.

Even if we were to find that community aid is an important objective separate from the goal of benefitting the residents of a given area, we would hold the statute unconstitutional because the fit between that objective and the preference law is not close. The law is seriously over- and underinclusive because it does not prioritize relief for those areas most affected by nonresident employment. Residents of less distressed zones may be unfairly advantaged compared to residents of more distressed zones. This means that nonresi-

right to engage in economic endeavor shall receive more or less scrutiny when challenged under the equal protection clause of the Alaska Constitution.

18. The superior court first looked to AS 36.10.-006 to discern the purpose of the statute. However, this statement of purpose was adopted as part of AS 36.10.010, the resident hire law overturned in *Robison*. Thus, this provision is of little value in determining the purposes of the regional preference law.

19. Similarly, we have observed that excluding "non-residents from public construction jobs so that more jobs will be available to Alaskans ... is not a permissible justification for discrimination under the privileges and immunities clause." *Robison v. Francis*, 713 P.2d 259, 267 (Alaska 1986). Although the Alaska Constitution does not have a privileges and immunities clause, it is our view that the equal rights, opportunities and protection clause of art. I, § 1 affords at least as much protection intrastate to fundamental rights that the privileges and immunities clause affords interstate. *See Lynden Trans., Inc. v. State*, 532 P.2d 700, 710 (Alaska 1975); *Robison*, 713 P.2d at 264 & n. 5, 271. The present statute discriminates against out-of-state residents as well as Alaska residents who do not reside in a given zone. It would be anomalous to conclude that out-of-state residents are afforded a higher degree of constitutional protection than in-state residents who are also discriminated against.

20. For example, article I, section 1 provides: *Inherent rights.* This constitution is dedicated to the principles that all persons have a natural right to life, liberty, the pursuit of happiness, and the enjoyment of the rewards of their own industry; that all persons are equal and entitled to equal rights, opportunities, and protection under the law; and that all persons have corresponding obligations to the people of the state.

dent workers will be unfairly disadvantaged in less distressed zones. Indeed, while the Commissioner selected the Borough as the first place to invoke the preference law, his own report showed that the Borough had the lowest percentage of nonresident workers in the twenty-nine zones surveyed. Because the economic criteria for designating an economically distressed zone are very broad given Alaska's historically high unemployment rate compared to the rest of the nation,[21] the Commissioner at any time could designate many regions within the state as distressed zones. The regional preference law thus has a potential for pervasive over- and underinclusiveness. Given the law's lack of prioritization together with its broad eligibility requirements, we would hold that the law's classification scheme is not closely related to its purpose.[22]

For the above reasons, we affirm the decision of the superior court that AS 36.10.160 violates the Alaska Constitution.

## VII. DAMAGES

■ The state and NANA argue that the superior court erred in concluding that Enserch did not waive its right to seek damages from the state for its enforcement of the regional preference law. We reverse the superior court's determination without deciding the waiver issue because Enserch does not have the right to seek damages for the enforcement of an unconstitutional law. In the sequel to *Robison*, we denied Francis's claim for nearly $31,000 in wages he would have earned but for the state's enforcement of AS 36.10.160's predecessor. *Robison v. Francis*, 777 P.2d 202 (Alaska 1989) ("*Robison II*"). In *Robison II*, we held that "the state may not be held liable for damages arising from the passage of unconstitutional legislation." 777 P.2d at 204. We explained the sound reason for this holding in *Vest v. Schafer*, 757 P.2d 588 (Alaska 1988):

> For a court to hold a state liable for unconstitutional legislation would introduce a profound conservative tilt into the lawmaking process. Legislators would become reluctant to . legislate, knowing that money damages were at stake if a court ultimately disagrees with their own appraisal of the constitutionality of a bill.

757 P.2d at 595. For these reasons, we hold that neither Enserch, Opel, nor LaRose is entitled to seek damages for the state's enforcement of AS 36.10.160.[23] Therefore, we need not consider whether the superior court was correct in concluding that Enserch did not waive its right to seek such damages from the state.

## VIII. CONCLUSION

We affirm the superior court's ruling that Enserch did not waive its right to challenge the constitutionality of the regional preference law, and that Enserch, Opel, and LaRose have standing. We conclude that the court did not abuse its discretion in allowing the individual plaintiffs to intervene. We hold that AS 36.10.160 and the implementing regulations and orders contravene the equal protection provision of the state constitution. Finally, we conclude that Enserch has no right to seek

---

**21.** Under the regional preference law, a region may be declared economically distressed if the unemployment rate within that region exceeds the U.S. unemployment rate by five percentage points. AS 36.10.160(b)(1). State studies indicated that the entire State of Alaska could have been designated an economically distressed zone in 1985. *See also Robison*, 713 P.2d at 265 n. 6 (setting forth unemployment rates in the U.S. and Alaska from 1970–1983).

**22.** Enserch argued that there was not a sufficiently close means-ends fit on the grounds that the law will not effectively achieve the legislature's purpose and it may have undesirable economic consequences. These arguments, which sound in substantive due process, are unrelated to the question whether the preferences are sufficiently tailored to the purposes of the law.

**23.** Enserch also is not entitled to recover damages for breach of contract since it promised to "comply with all laws and regulations regarding the hiring of Alaska residents *now in effect or that may subsequently take effect.*" While this clause does not amount to a waiver of Enserch's right to challenge the constitutionality of the regional preference law, the clause is a promise to comply with the law and its implementing regulations. By agreeing to comply with the Kotzebue hiring preference, Enserch waived its right to seek contract damages for increased costs due to its imposition.

damages for the state's enforcement of the unconstitutional law. The judgment of the superior court is AFFIRMED in part and REVERSED in part.

MATTHEWS, C.J., joins, and BURKE, J., joins in part.

BURKE, J., concurs.

COMPTON, J., dissents.

RABINOWITZ, J., dissents joined by COMPTON, J.

BURKE, Justice, concurring.

The question in this case, as I see it, is not whether the state's interest in promoting regional hire outweighs the individual plaintiffs' interest in equal treatment. The question is whether the state is doing something which is prohibited by the Alaska Constitution.

Some things are unlawful simply because they are constitutionally prohibited. Ex post facto laws and bills of attainder, for example, are unlawful under both the state[1] and federal[2] constitutions, whether or not there is an important, even an overwhelming, governmental (public) interest to be served by passage and enforcement of such measures. Thus, one of our earliest cases contains the observation "that the [state's] police power—broad and comprehensive though it is—may not be exercised in contravention of plain and unambiguous constitutional inhibitions." *Matthews v. Quinton*, 362 P.2d 932, 944 (Alaska 1961).

Article I, section 1 of the Alaska Constitution states, among other things, "that all persons are equal and entitled to equal rights [and] opportunities." This, as I read it, amounts to an express limitation upon the otherwise plenary power of the state to deny its citizens equal employment rights and opportunities.[3]

Since it is possible for us to do so, we must construe article I, section 1 to be self-executing. Alaska Const. art. XII, § 9.

1. Alaska Const. art. I, § 15.

2. U.S. Const. art. I, § 9.

3. Unlike the federal government, which may exercise only those powers expressly or impli-

Thus construed, I believe article I, section 1 prohibits the regional hiring preference authorized by AS 36.10.160 and imposed in the case at bar. *See Robison v. Francis*, 713 P.2d 259, 271–72 (Alaska 1986) (Burke, J. concurring) and *Shafer v. Vest*, 680 P.2d 1169, 1171–72 (Alaska 1984) (Burke, C.J., concurring).

My conclusion renders much of the court's "equal protection" analysis superfluous. I concur, however, in the result and the views expressed in the remainder of the court's opinion.

COMPTON, Justice, dissenting.

I agree with the court's resolution of the intervention, standing and waiver issues. I suggest, however, that the court has misapplied the Alaska equal protection clause to this case.

The court, in a footnote, significantly changes the way an equal protection analysis is conducted under the Alaska equal protection clause. Op. at n. 19. The court creates a federal privileges and immunities "floor" for an Alaska equal protection analysis when a legislative enactment impairs a right arguably protected under the Alaska equal protection clause. If a nonresident of Alaska could successfully challenge the enactment under the federal privileges and immunities clause, then the enactment violates the Alaska equal protection clause. If it does not violate the federal privileges and immunities clause, the enactment must then be examined under the three-part *Brown* equal protection analysis. *Alaska Pacific Assurance Co. v. Brown*, 687 P.2d 264, 269–70 (Alaska 1984).

Regardless of the validity of this fundamental change in the way equal protection claims are analyzed under the Alaska Constitution, an examination of the preference law under this "new" approach does not support the court's conclusion that the preference law violates the Alaska equal

edly delegated to it by the United States Constitution, a state's legislative power is plenary. Thus, a state is free to enact any law not forbidden by its own constitution or federal law. *Deras v. Myers*, 272 Or. 47, 535 P.2d 541, 544 n. 3 (1975) (citation omitted).

protection clause. In analyzing this preference law, I will use the approach suggested by the court in footnote 19, first applying federal privileges and immunities law, and then the three-part *Brown* test.

The United States Supreme Court considered a law similar to the one at issue here in *United Bldg. & Constr. Trades Council v. Mayor of Camden,* 465 U.S. 208, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984). The City of Camden enacted an ordinance requiring that at least 40 percent of the employees of contractors and subcontractors working on city construction projects be Camden residents. Although the Supreme Court remanded the case for further factual findings it stated that:

> Every inquiry under the Privileges and Immunities Clause "must ... be conducted with due regard for the principle that the States should have considerable leeway in analyzing local evils and in prescribing appropriate cures." This caution is particularly appropriate when a government body is merely setting conditions on the expenditure of funds it controls.

*Id.* at 222–23, 104 S.Ct. at 1030 (citations omitted).

Notwithstanding that the law was still to be examined under the privileges and immunities clause, the Supreme Court held that:

> The fact that Camden is expending its own funds or funds it administers in accordance with the terms of a grant is certainly a factor—perhaps the crucial factor—to be considered in evaluating whether the statute's discrimination violates the Privileges and Immunities Clause.

*Id.* at 221, 104 S.Ct. at 1029.

The Supreme Court in *United Building* distinguished the Alaska hire law at issue in *Hicklin v. Orbeck,* 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978), stating that the Alaska hire law was invalidated as " 'an attempt to force virtually all businesses that benefit in some way from the economic ripple effect of Alaska's decision to develop its oil and gas resources to bias their employment practices in favor of the State's residents.' " *United Building,* 465 U.S. at 223, 104 S.Ct. at 1030 (quoting *Hicklin,* 437 U.S. at 532, 98 S.Ct. at 2491). In contrast, the Camden ordinance was "limited in scope to employees working directly on city public works projects." *Id.*

The same distinction can be made in the present case; the Alaska hire law is only applicable to publicly funded construction contracts. While the Supreme Court in *United Building* found it "impossible to evaluate Camden's justification [for the law] on the record as it now stands," *id.,* it is clear that the scope of the law is an important factor in determining whether a privileges and immunities violation exists.

In addition, the justifications for the law, the "evil" presented by nonresidents and the way in which the law seeks to reach its objectives are relevant considerations.

In *Hicklin,* the Supreme Court held an Alaska hire law unconstitutional under the privileges and immunities clause of the United States Constitution. 437 U.S. 518, 98 S.Ct. 2482. The Alaska hire law at issue in *Hicklin* was enacted for the purpose of reducing unemployment within Alaska. The law required that " 'all oil and gas leases, easements or right-of-way permits for oil or gas pipeline purposes, unitization agreements, or any renegotiation of any of the preceding to which the state is a party' contain a provision 'requiring the employment of qualified Alaska residents' in preference to nonresidents." *Id.* at 520, 98 S.Ct. at 2485 (quoting AS 38.40.030(a) (1977)).

The Supreme Court, using an analysis first enunciated in *Toomer v. Witsell,* 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1947), *reh'g denied* 335 U.S. 837, 69 S.Ct. 12, 93 L.Ed. 389 (1948), stated that nonresidents were not "a peculiar source of the evil" of Alaska's "uniquely high unemployment." *Id.* 437 U.S. at 526, 98 S.Ct. at 2487 (citations omitted). The Supreme Court noted that:

> What evidence the record does contain indicates that the major cause of Alaska's high unemployment was not the influx of nonresidents seeking employment, but rather the fact that a substan-

tial number of Alaska's jobless residents—especially the unemployed Eskimo and Indian residents—were unable to secure employment either because of their lack of education and job training or because of their geographical remoteness from job opportunities; and that the employment of nonresidents threatened to deny jobs to Alaska residents only to the extent that jobs for which untrained residents were being prepared might be filled by nonresidents before the residents' training was completed.

*Id.* at 526–27, 98 S.Ct. at 2487–88.[1]

The Supreme Court went on to state that even if nonresidents were "a peculiar source of evil," the Alaska hire law failed to pass constitutional muster because the discrimination against nonresidents did not bear a "substantial relationship to the particular 'evil' they are said to present." *Id.* at 527, 98 S.Ct. at 2488. No "substantial relationship" existed because the Alaska hire law created an across-the-board preference for residents over nonresidents for all jobs covered by the law, *id.,* noting:

> If Alaska is to attempt to ease its unemployment problem by forcing employers within the State to discriminate against nonresidents—again, a policy which may present serious constitutional questions—the means by which it does so must be more closely tailored to aid the unemployed the Act is intended to benefit. Even if a statute granting an em-

ployment preference to unemployed residents or to residents enrolled in job-training programs might be permissible, Alaska Hire's across-the-board grant of a job preference to all Alaskan residents clearly is not.

*Id.* at 527–28, 98 S.Ct. at 2488.

> [A]lthough the Privileges and Immunities Clause 'does not preclude disparity of treatment in the many situations where there are perfectly valid independent reasons for it ... [i]t does bar discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States.'

*Id.* at 525, 98 S.Ct. at 2487 (quoting *Toomer,* 334 U.S. at 396, 68 S.Ct. at 1162).

In this case nonresidents are being discriminated against because only a finite number of job opportunities exist in geographically remote areas. The court mischaracterizes the state's purpose in enacting the preference law as intending to confer an economic benefit on workers in certain regions. This, however, is only the *means* by which the state seeks to achieve the *end* of reducing, to the maximum extent possible, alcoholism, child abuse, domestic violence and other related social ills in certain regions of Alaska.[2]

In addition, this Alaska hire law requires a "reasonable relationship between the danger represented by non-citizens, as a

---

1. The Supreme Court referred to a report which discussed reasons for high unemployment rates in Alaska. The report remarked that:

    The skill levels of in-migrants and seasonal workers are generally higher than those of the unemployed or under-employed resident workers. *Their ability to command jobs in Alaska is a sympton* [sic] *of, rather than the cause of conditions resulting in high unemployment rates,* particularly among Alaska Natives. Those who need the jobs the most tend to be undereducated, untrained, or living in areas of the state remote from job opportunities. Unless unemployed residents—most of whom are Eskimos and Indians—have access to job markets and receive the education and training required to fit them into Alaska's increasingly technological economy and unless there is a restructuring of labor demands, new jobs will continue to be filled by persons from other states who have the necessary

    qualifications. Federal Field Committee for Development Planning in Alaska, Economic Outlook for Alaska 311–312 (1971) (emphasis added; footnote omitted).

    *Hicklin,* 437 U.S. 527, n. 10, 98 S.Ct. 2488, n. 10. There is no reason to believe that these observations do not hold true today.

2. This objective is apparent from the statute and regulations. The preference does not even become applicable until the commissioner has determined that "the lack of employment opportunities in the zone has substantially contributed to serious social or economic problems in the zone." AS 36.10.160(b)(2). "[T]he lack of employment opportunities has substantially contributed to serious social or economic problems if changes in indicators of social and economic problems are linked to changes in the number of people who want to work and are unable to obtain work." 8 AAC 30.068.

class, and the ... discrimination practiced upon them." *Toomer*, 334 U.S. at 399, 68 S.Ct. at 1163. Unlike the situation in *Toomer* and *Hicklin* where the discrimination between residents and nonresidents was total, this hire law creates only a partial preference in favor of eligible residents in certain occupations in economically distressed areas. Once again, it is hard to imagine a law which more narrowly balances an individual's right to employment with the state's concern for remedying social ills among Alaska residents living in these areas.

We now turn to an examination of the preference law under the three-part *Brown* analysis. The court characterizes the right affected by the regional preference law as the right to engage in an economic endeavor within a particular industry and concludes that it is an important one. As a result, the court states that close scrutiny of legislative enactments which impair this right require the underlying state interest to be legitimate and important and the nexus between this interest and the enactment be close.

Once again, it is the court's declaration of the illegitimacy of the state interest underlying the preference law at issue in this appeal that is misguided. The court concludes that the state's interest in enacting the preference law was to confer an economic benefit on workers in certain regions of the state. The characterization of this underlying interest as purely economic in nature is simply wrong.

Conferring economic benefits on workers in designated regions is the *means* by which the state is seeking to achieve the *end* of alleviating social ills in certain regions of Alaska. *See supra* note 2. It cannot be seriously argued that the state's interest in reducing to the maximum extent possible the alcoholism, child abuse, domestic violence and related social ills in areas where they are causally related to high unemployment is not a legitimate state goal. It also cannot be seriously argued that the state's interest is not equally important, if not more important, than the

individual's right to engage in a particular economic endeavor. *See* Alaska Const. art. VII, § 4 ("The legislature shall provide for the promotion and protection of public health"); § 5 ("The legislature shall provide for public welfare").

The court states that even if it found the legislative purpose to be legitimate, it would strike down the preference law because "it does not prioritize relief for those areas most affected by nonresident employment." The court is requiring the legislature to use the least restrictive means to achieve the goal, effectively subjecting the law to strict scrutiny.

The court does not say, nor could it, that the nexus between the state interest and the state's means of furthering that interest are not reasonable. The commissioner does not apply the preference to a region until the link is established between a high level of unemployment and the social ills sought to be reduced. AS 36.10.160(b)(2); 8 AAC 30.068. "To require a reasonable nexus between legislative means and ends is not to demand perfection in classification." *Rose v. Commercial Fisheries Entry Comm'n*, 647 P.2d 154, 160 (Alaska 1982).

In my view the court places undue emphasis on an individual's right to employment, unnecessarily subordinating to that right the constitutionally permissible state objective of reducing to the maximum extent possible the endemic alcoholism, child abuse, domestic violence and related social ills in certain areas of Alaska. As a result, I would uphold the law as constitutional.

RABINOWITZ, Justice, with whom COMPTON, Justice, joins, dissenting.

I dissent from the court's holding that AS 36.10.160 and implementing regulations contravene the equal protection clause of article I, section 1 of the Alaska Constitution.[1] In my opinion the laws in question serve, not disserve, the art. I, § 1 promise of equality under law.

Second, as a matter of constitutional construction, I disagree with the court's con-

---

**1.** I join in the court's disposition of the interven- tion, standing and waiver issues.

clusion that "the equal rights, opportunities and protection clause of art. I § 1 affords at least as much protection intrastate to fundamental rights that the privileges and immunities clause affords interstate." Federal privileges and immunities doctrine is not an appropriate analogue to state equal protection. Neither in my opinion does this forced analogy point to any constitutional deficiency in the regional preference laws as enacted or as applied in the case at bar.

ALASKA STATUTE 36.10.160.

Enserch's contract with the state required Enserch to "comply with all applicable laws and regulations regarding the hiring of Alaska residents," including AS 36.10.160, the focal point of this appeal. AS 36.10.160(b) provides that:

The commissioner [of the Department of Labor] shall determine that an economically distressed zone exists if the commissioner finds that

(1) the per capita income of residents of the zone is less than 90 percent of the per capita income of the United States as a whole, or the unemployment rate in the zone exceeds the national rate of unemployment by at least five percentage points;

(2) the lack of employment opportunities in the zone has substantially contributed to serious social or economic problems in the zone; and

(3) employment of workers who are not residents is a peculiar source of unemployment of residents of the zone.

Following a determination by the commissioner that an economically distressed zone exists, and for the next two fiscal years after such a determination, section (b) provides that:

... qualified residents of the zone who are eligible under AS 36.10.140 shall be given preference in hiring for at least 50 percent of employment on each project under AS 36.10.180 that is wholly or partially sited within the zone. The preference applies on a craft-by-craft or occupational basis.[2]

For purposes of summary judgment, Enserch conceded that the commissioner made the necessary findings and complied with

**2.** 8 AAC 30.065, .068 and .069 articulate criteria to implement AS 36.10.160. In this regard 8 AAC 30.065 provides:

Hiring Preference for Residents of Economically Distressed Zone. (a) For purposes of AS 36.10.160, the commissioner will determine that an area is an economically distressed zone if

(1) for the most recent 12–month period for which figures are available,

(A) the per capita income of residents of the area is less than 90 per cent of the per capita income of the United States as a whole, or

(B) the average unemployment rate in the area exceeds the average national unemployment rate by at least 5 percentage points; for example, if the average national unemployment rate is 5 percent, the average unemployment rate of the area must be at least 10 percent for the area to meet the criteria of this subparagraph;

(2) the lack of employment opportunities has substantially contributed to serious social or economic problems in the area, as determined under 8 AAC 30.068; and

(3) the employment of nonresidents is a peculiar source of unemployment of residents of the area, as determined under 8 AAC 30.069.

(b) For a public-funded project, the minimum percentage of positions which must be reserved under AS 36.10.160 for eligible residents in a craft or occupation subject to a hiring preference, is 50 percent.

8 AAC 30.068 provides:

Determination That Lack of Employment Opportunities Has Substantially Contributed to Serious Social or Economic Problems. For purposes of AS 36.10.150—36.10.175 and this chapter, the lack of employment opportunities has substantially contributed to serious social or economic problems if changes in indicators of social and economic problems are linked to changes in the number of people who want to work and are unable to obtain work. The commissioner will use correlation analysis, testimony, professional studies, or other evidence to establish the relationship between unemployment and social or economic problems.

8 AAC 30.069 provides:

Determination of Peculiar Source of Unemployment. For purposes of AS 36.10.150—36.10.175, and 8 AAC 30.064—8 AAC 30.067, the commissioner will determine that employment of nonresidents is a peculiar source of unemployment if more than 10 percent of the residents of an area who are trained or experienced in a craft or occupation are unemployed and more than 10 percent of the total number of workers employed in that area in that craft or occupation are not residents of that area.

the requirements of AS 36.10.160 in his designation of the Northwest Arctic Borough as an economically distressed zone. Relying upon this concession, and upon evidence of the legislative purpose in the record, the superior court did not require the benefit of a full evidentiary record to show how this law affected job seekers from within and without the assisted zone; neither did the superior court derive the benefit a full evidentiary presentation would confer in illuminating the purpose, means, and closeness of the fit of the legislation in question.

EQUAL PROTECTION.

Turning now to an analysis of the equal protection issues under article I, section 1 of the Alaska Constitution, I agree with the court that the right to pursue a livelihood is an important right.[3] Thus on Alaska's sliding equal protection scale any infringement caused by implementation of AS 36.10.160 is "deserving of close scrutiny." *Patrick v. Lynden Transport, Inc.*, 765 P.2d 1375, 1379 (Alaska 1988).

Concerning the purposes of AS 36.10.160, again I agree with the court's assessment that a number of important goals are sought to be furthered by this legislation, amongst which are: the preservation of the social structures in economically distressed zones, the reduction of unemployment in the economically distressed zones, the alleviation of social harms flowing from chronic unemployment, and assistance of economically disadvantaged residents of economically distressed zones.

My fundamental disagreement with the court centers on its conclusion that these legislative goals are illegitimate because AS 36.10.160, and regulations implementing this statute, accord disparate treatment to unemployed workers in one region of Alaska in order to confer an economic benefit on similarly situated workers in another region of Alaska. I cannot agree that such geographic discrimination must always run afoul of article I, section 1 of the Alaska Constitution. Unlike *Lynden Transport, Inc. v. State*, 532 P.2d 700, 710 (Alaska 1975), upon which the court relies, "residence" for purposes of AS 36.10.160 is a personal not political attribute. Article I, section 1 should not bar discrimination in favor of a "class" most in need of aid. I would not denigrate such geographically oriented assistance without an inquiry into the statute's operation and effect—an inquiry obviated, but not answered, by the court's holding of illegitimacy. In my opinion, the court's semantic discourse on the relation between communities and individuals is no substitute for ascertaining whether individual needs bear some relation to geography—if such a relation were in doubt. I believe that equality under law in Alaska cannot be realized on an individual basis without legislative consideration of the particular and peculiar characteristics of the diverse regions and communities in which Alaskan's reside.

Neither, in my opinion, is the ends/means fit here insufficiently close to satisfy Alaskas equal protection test. I cannot characterize the relation of the ends to means articulated in AS 36.10.160, and the applicable regulations, as "not close," "seriously over and under inclusive" and thus fatal.[4] It is clear from the text of AS

---

3. In my view Enserch has no right which is entitled to equal protection in the context of this case. Although I have noted my agreement with the court's conclusion that the individual plaintiffs have important rights protected by art. I, § 1, these individual plaintiffs can qualify for 50% of the available craft openings in question.

4. In *Commercial Fisheries Entry Comm'n v. Apokedak*, 606 P.2d 1255, 1267 (Alaska 1980) we observed that:

The legislature in its wisdom could conceivably have better provided for such instances. But equal protection, even under Alaska's stricter standard, does not demand perfection in classification. If it did, there would be few laws establishing classifications that would sustain an equal protection challenge. (Footnote omitted.)

*See also Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491, 501–02 (1970):

In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect.... [I]t does not offend the Constitution simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality." *Lindsley v. Natural Carbon-*

36.10.160 and the regulations set out in note 2, that no employment preferences are granted on public projects unless particularly severe conditions require the granting of such preferences. The employment preferences in question are limited to a particular region, or regions, and to a limited percentage of the available jobs in certain designated crafts on public projects within a designated zone. Statistical evidence is employed to establish the need for any preferences, the relationship between unemployment and public assistance payments, domestic violence, sexual abuse, alcoholism, drug use, and suicide. My reading of AS 36.10.160 and 8 AAC 30.065, 8 AAC 30.068 and 8 AAC 30.069 persuades me that the legislature carefully fashioned a close fit between the objectives of this legislation and the means selected to achieve the legislation's important legitimate goals.

## PRIVILEGES AND IMMUNITIES.

As noted at the outset I cannot agree with the court's incorporation of the privileges and immunities clause, and its protections, into the equal rights, opportunities and protection clause of art. I, § 1 of the Alaska Constitution.[5] Historically the priv-

ileges and immunities clause of article IV, section 2 of the Federal Constitution was intended to help fuse into one Nation a collection of independent sovereign states. *Toomer v. Witsell*, 334 U.S. 385, 395–96, 68 S.Ct. 1156, 1161–62, 92 L.Ed. 1460 (1948). As we noted in *Robison v. Francis*, 713 P.2d 259, 263 (Alaska 1986):

> The privileges and immunities clause does not protect non-residents against all forms of discrimination. Its reach is limited to "fundamental rights"—rights involving "basic and essential activities, interference with which would frustrate the purposes of the foundation of the union." *Baldwin v. Montana Fish and Game Commission*, 436 U.S. 371, 387, 98 S.Ct. 1852, 1862, 56 L.Ed.2d 354, 367–68 (1978).

Examination of the records of Alaska's constitutional convention fails to disclose any intent on the framers' part to incorporate the entire corpus of federal privileges and immunities doctrine into Alaska's equal protection provisions. Nor is the court's reliance upon *Robison* and *Lynden Transport, Inc. v. State*, 532 P.2d 700 (Alaska 1975), dispositive of the question.[6] Both *Lynden* and *Robison* involved explicit chal-

---

 *ic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369, 377 [ (1911) ]. "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." *Metropolis Theatre Co. v. City of Chicago*, 228 U.S. 61, 69–70, 33 S.Ct. 441, 443, 57 L.Ed. 730, 734 [ (1913) ].

**5.** The court misreads *United Bldg. and Constr. Trades Council of Camden County and Vicinity v. Mayor and Council of City of Camden*, 465 U.S. 208, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984) to subject AS 36.10.160 to federal privileges and immunities scrutiny even in the absence of a challenge by an out-of-state resident. To the contrary, the Supreme Court held the *Camden* ordinance subject to article IV privileges and immunities scrutiny "at the behest of" and in "a particular instance of discrimination against" out-of-state residents. *Id.* at 218, 104 S.Ct. at 1027. While *Camden* presented such a claim, *id.* at 212 n. 4, 104 S.Ct. at 1024 n. 4, the record before us today does not.

**6.** That privileges and immunities analysis is similar to equal protection analysis does not compel today's holding that "the equal rights, opportunities, and protection clause of art. I,

§ 1 affords the same protection intrastate to fundamental rights that the privileges and immunities clause affords interstate." Indeed *Robison*, 713 P.2d at 264 n. 5, expressly notes several *distinctions* between the privileges and immunities clause and the equal protection clause:

> The coverage of the two clauses is overlapping but not identical. The privileges and immunities clause does not apply to corporations, or to aliens, while the equal protection clause does, and the equal protection clause applies to many classifications, while the privileges and immunities clause applies only to those based on residence. L. Tribe, *American Constitutional Law* § 6–33 at 411–12. Alienage classifications involving non-U.S. citizens are subject to at least an intermediate level of review under federal equal protection doctrine. Tribe, *supra* § 16–31 at 1089–90; *Sugarman v. Dougall*, 413 U.S. 634, 642, 93 S.Ct. [2842] 2847, 37 L.Ed.2d 853, 860 (1973). The removal of the "disabilities of alienage" in the sense of discrimination based on residency in another state of the United States is central to the privileges and immunities clause. *Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 180, 19 L.Ed. 357, 360 (1868).

lenges under the privileges and immunities clause. In contrast, nothing in the instant record presents a unilateral action by a political subdivision to the detriment of a greater union.[7] Simply, zones are not competing political sovereigns; rather, like corporations, they exist at the discretion of the state. In my opinion, equal individual rights, opportunities and protection under law requires rather than forbids Alaska's legislators to perceive their constituents as members of the diverse communities in which they live.

Finally, even if privileges and immunities rightly inhered in Alaska's equal protections provisions, I would conclude that the regional preference laws are valid. Regional economic distress, and the statute's limited application to 50% of designated state funded jobs, likens this case more to *Camden*[8] than to *Robison*.[9] I note my concurrence in Justice Compton's dissent to this facet of the court's opinion.

In summary, even assuming the appropriateness of a privileges and immunities analysis, I would conclude that the regional preference legislation is constitutional. The purposes served by the legislation are significant and legitimate, and the means employed to meet these purposes reflect a sufficiently close relationship to the legisla-

tive goals to withstand heightened scrutiny.

---

7. The record presents no attack on either the statutory definition or its implementation in defining the Northwest Arctic Borough as a zone. While the preferred zone in this case tracks political boundaries, I note this is not necessarily the case: AS 36.10.990 defines zone to include "a census area in the state, an economic region of the state, and the state as a whole." The identity of an individual and her community is particularly evident where a zone maps an economic region.

8. *United Bldg. and Constr. Trades Council of Camden County and Vicinity v. Mayor and Council of City of Camden*, 465 U.S. 208, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984).

9. As we stated in *Robison*, 713 P.2d at 269:

Furthermore, the differences between the local hire act here and the ordinance in *Camden* are noteworthy. As the findings of the trial court indicate, the Alaskan economy is a dynamic and growing one, property values are increasing, and Alaska's population is expanding rapidly. In contrast, in *Camden* the city claimed that it was in a condition of

decay, with property values eroding, population sharply declining, and unemployment "spiralling." *Id.* [465 U.S.] at 222, 104 S.Ct. at 1030, 79 L.Ed.2d at 261. While Alaska's unemployment is chronically high due in large part to unique conditions in rural areas, the economy of the state does not seem remotely comparable to the picture of "grave economic and social ills" suggested in *Camden*. In addition, it appears that the discrimination effected by the Alaska statute is greater than that in *Camden*. Public works account for the majority of commercial construction activity in Alaska. While the opinion does not indicate whether the same is true in Camden, the exclusion mandated by our state—90% to 100% resident workers required—is far more absolute than that in the Camden ordinance. As presented to the Court, the ordinance contained only a goal, not a requirement, that 40% of workers on public works construction projects be residents. For these reasons, unlike the Wyoming Supreme Court in [*State v.*] *Antonich* [694 P.2d 60 (Wyo.1985)] we do not regard *Camden* as precedent supporting approval of our local hire law.