*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| STATE OF ALASKA, DEPARTMENT ) | |
| OF FAMILY & COMMUNITY ) | Supreme Court Nos. S-18249/18259 |
| SERVICES, OFFICE OF ) | |
| CHILDREN'S SERVICES, and KIM ) | Superior Court No. 3AN-14-07961 CI |
| KOVOL and KIM GUAY, in an official ) | |
| capacity, ) | O P I N I O N |
| ) | |
| Appellants and ) | No. 7760 – March 28, 2025 |
| Cross-Appellees, ) | |
| ) | |
| v. ) | |
| ) | |
| Z.C., through her next friend LORENZ ) | |
| KAUFMAN, on behalf of herself and ) | |
| those similarly situated, ) | |
| ) | |
| Appellees and ) | |
| Cross-Appellants. ) | |
| ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, William F. Morse, Judge.

Appearances: Katherine Demarest and Lael Harrison, Assistant Attorneys General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellants and Cross-Appellees. Goriune Dudukgian and James J. Davis Jr., Northern Justice Project, LLC, Anchorage, for Appellees and Cross-Appellants. Amy Harfeld, Children's Advocacy Institute, San Diego, California, and Mitchell Y. Mirviss and Kyle E. Scherer, Venable LLP, Washington, D.C., for Amici Curiae Facing Foster Care in Alaska, Children's Advocacy Institute, Children's Defense Fund, Children's Rights, First

Focus on Children, Foundation for Research on Equal Opportunity, Gen Justice, Juvenile Law Center, National Association of Counsel for Children, National Center for Youth Law, Partnership for America's Children, Youth Law Center, and Professor Daniel L. Hatcher.

Before: Maassen, Chief Justice, Carney, Henderson, and Pate, Justices, and Winfree, Senior Justice.[*] [Borghesan, Justice, not participating.]

HENDERSON, Justice.
CARNEY, Justice, concurring.
PATE, Justice, with whom WINFREE, Senior Justice, joins, dissenting in part.

## I. INTRODUCTION

A group of foster children challenged the Office of Children's Services' (OCS) systematic practice of using foster children's federal Social Security benefits to repay itself for the cost of foster care. The children alleged that the practice violates the due process and equal protection clauses of the Alaska Constitution and requested restitution for these alleged violations. The superior court recognized a due process violation and ordered OCS to begin notifying foster children of its practice with respect to Social Security benefits. The court rejected the children's equal protection and restitution claims as preempted by federal law. Both parties appeal. Agreeing with the superior court's conclusions, we affirm.

---

[*] Sitting by assignment made under article IV, section 11 of the Alaska Constitution and Alaska Administrative Rule 23(a).

## II.  FACTS AND PROCEEDINGS

### A.  Facts

#### 1.  Social Security benefits and the representative payee system

Certain people in the United States are eligible to receive money from the federal government through two programs created under the Social Security Act.[1]  One program is called the Old-Age, Survivor's, and Disability Insurance Program (OASDI).[2]  The other program is called Supplemental Security Income (SSI).[3]  Each program has its own requirements and statutory scheme.  The differences between the two programs, however, are not particularly relevant to this case; therefore, unless otherwise noted, we refer to both programs collectively as "Social Security benefits" or "benefits."[4]  Both programs are administered solely by the Social Security Administration (SSA) via a complex statutory and regulatory scheme.[5]

Generally, once a person qualifies for benefits the SSA pays that person directly.  However, for incapacitated persons and minors, the SSA pays the benefits indirectly through another.[6]  The person or entity receiving another's benefits is known

---

[1]  42 U.S.C. §§ 401-34, 1381-85.

[2]  42 U.S.C. §§ 401-34.

[3]  42 U.S.C. §§ 1381-85.

[4]  *See also Guardianship Est. of Keffeler ex. Rel. Pierce v. State* (*Keffeler III*), 88 P.3d 949, 952 (Wash. 2004) ("Although the two types of benefits are separate and distinct programs, we agree . . . that for the purpose of this litigation and the issues raised, they are comparable.").  *Keffeler III* dealt with an almost identical issue as this case.

[5]  *See* 42 U.S.C. §§ 405(a), 1381a, 1383b(a).

[6]  20 C.F.R. §§ 404.2010(b), 416.610(b) (2023); SOC. SEC. ADMIN., PROGRAM OPERATIONS MANUAL SYSTEM (POMS), GN 00502.070, *Policy For Determining Capability In Children*, DETERMINING CAPABILITY – CHILDREN (2023). The POMS is "a primary source of information used by Social Security employees to process claims for Social Security benefits." *POMS Home*, SOC. SEC. ADMIN.,

as a "representative payee" (rep payee).[7]  The rep payee is required to keep the benefits separate, and to only use the benefits on behalf of the beneficiary and in the beneficiary's best interests.[8]

Benefits are typically required to be used for "current maintenance," which includes costs associated with obtaining food, shelter, clothing, medical care, and personal comfort items.[9]  Such maintenance may also include things that would improve the beneficiary's "daily living conditions" such as better medical care, a down payment on a home, home improvement projects, furniture, a television, a car, movie or concert tickets, magazine subscriptions, and in some instances education or job skills training.[10]  One limitation that applies only to SSI benefits is that SSI beneficiaries cannot accumulate more than $2,000 in "nonexcludable resources."[11]  The regulations provide a long list of excluded assets including a home, household goods, a car, nonbusiness property, certain other public assistance, and many other exclusions.[12]

---

https://secure.ssa.gov/apps10/ (last visited Nov. 21, 2024).  The public version of the POMS is identical to the version used by SSA employees except that it does not include "internal data entry and sensitive content instructions." *Id.*  The public version of the POMS is available at https://secure.ssa.gov/apps10/.  For clarity, the web address will be omitted from all further citations.

[7]     20 C.F.R. §§ 404.2010, 416.610 (2023).

[8]     20 C.F.R. §§ 404.2035, 416.635 (2023).

[9]     20 C.F.R. §§ 404.2040(a)(1), 416.640(a) (2023).

[10]     SOC. SEC. ADMIN., PUB. NO. 05-10076, A GUIDE FOR REPRESENTATIVE PAYEES 4-5 (2022), https://www.ssa.gov/pubs/EN-05-10076.pdf.

[11]     20 C.F.R. § 416.1205(c) (2023).

[12]     20 C.F.R. §§ 416.1210-416.1266 (2023).

Besides this limitation, and several other minor differences, rep payees for SSI and OASDI benefits are regulated identically.[13]

To become the rep payee for a beneficiary, a person or qualified entity must submit an application to the SSA.[14] The SSA is bound to select a rep payee that will "best serve the interest of the beneficiary."[15] The SSA considers factors such as the relationship of the person to the beneficiary, the level of interest that person shows, whether the person is in a position to look after the needs of the beneficiary, and any legal authority the potential rep payee might have to act on behalf of the beneficiary.[16] There are also regulatory preferences for assigning a rep payee.[17] While these preferences are "flexible," natural or adoptive custodial parents generally have the highest priority, followed by non-custodial parents, custodial relatives or stepparents, non-custodial relatives, and close friends; "authorized social agenc[ies] or custodial institution[s]" have the lowest priority.[18]

SSA field offices are "responsible for finding the person or organization best suited to be payee."[19] When considering the application of a foster care agency as

---

[13] *E.g.*, *compare* 20 C.F.R. § 404.2035 (2023) (detailing responsibilities of OASDI rep payee), *with* 20 C.F.R. § 416.635 (2023) (detailing responsibilities of SSI rep payee).

[14] SOC. SEC. ADMIN., POMS, GN 00502.107, THE REPRESENTATIVE PAYEE APPLICATION (2023).

[15] 20 C.F.R. §§ 404.2020, 416.620 (2023).

[16] 20 C.F.R. §§ 404.2020, 416.620 (2023); SEC. ADMIN., POMS, GN 00502.100, HOW TO FIND PAYEE LEADS (2023).

[17] 20 C.F.R. §§ 404.2021, 416.621 (2023).

[18] 20 C.F.R. §§ 404.2021, 416.621 (2023); s*ee also* SOC. SEC. ADMIN., POMS, GN 00502.105, PREFERRED REPRESENTATIVE PAYEE ORDER OF SELECTION CHARTS (2017).

[19] SOC. SEC. ADMIN., POMS, GN 00502.100, HOW TO FIND PAYEE LEADS (2023).

a rep payee, the SSA must "conduct[] a complete investigation of the . . . organizational [rep payee] applicant, us[e] the payee preference list appropriately to identify when other payee leads should be developed and provid[e] due process to the child's parent and/or legal guardian."[20] The SSA's POMS provides detail on procedures SSA employees should follow to investigate, select, and assign a foster care agency as a rep payee.[21] The POMS warns SSA employees to "not automatically appoint the foster care agency as payee for a child in foster care," to "gather and consider all pertinent information," to "decide each case on its own merit," to "not assume the parent is 'not qualified' just because the child has been placed in foster care," and to "not overlook any potential source to find a suitable payee."[22] The POMS directs employees that even when a foster care agency has legal custody of a child, "there may be other concerned relatives who would be better choices as payees."[23] It similarly directs that if an employee is able to identify a payee candidate of higher preference than a foster care agency, the employee must "contact that person and document the reason they are or are not interested in filing as payee before appointing the [foster care] agency."[24] Employees are also directed to ensure that the foster care agency "answers all pertinent questions during the payee application process" and if it answers "no" to the question about whether there is a parent or family member that may qualify to serve as rep

---

[20] SOC. SEC. ADMIN., POMS, GN 00502.159, ADDITIONAL CONSIDERATIONS WHEN FOSTER CARE AGENCY IS INVOLVED (2023).

[21] *Id.*

[22] *Id.*; SOC. SEC. ADMIN., POMS, GN 00502.100, HOW TO FIND PAYEE LEADS (2023).

[23] SOC. SEC. ADMIN., POMS, GN 00502.159, ADDITIONAL CONSIDERATIONS WHEN FOSTER CARE AGENCY IS INVOLVED (2023).

[24] *Id.*

payee,[25] the employee is directed to "review all court documents obtained . . . to determine if [there is] any record of a parent or other family member."[26]

When a rep payee is selected for a minor the SSA must send a written notice "solely to the legal guardian or legal representative."[27] That notice must be "clearly written" and it "shall identify the person to be designated as [the rep payee], and shall explain to the reader the right . . . to appeal the designation of a particular [rep payee]."[28] The POMS similarly directs employees that the SSA has a "legal requirement" to "provide advance notice about the payee appointment to the proper person(s)."[29] "The parent(s) (or legal guardian) of a child in foster care must be provided advance notice of the appointment unless their parental rights were terminated by a court."[30] In sum, the investigation, identification, and selection of a rep payee, as well as notice of these processes, are fully controlled by federal law.

### 2. OCS's self-reimbursing representative payee scheme

OCS acknowledges that, since at least 2003, it has engaged in a systematic practice of applying to be the rep payee for any eligible child in its custody and, if appointed, using the child's Social Security benefits to reimburse itself for foster care

---

[25] This question requires an applicant to identify if the child has a living natural or adoptive parent, and to list the name and relationship of any other relative or close friend that has "provided support and/or show[n] active interest with the claimant." *See id.*

[26] SOC. SEC. ADMIN., POMS, GN 00502.159, ADDITIONAL CONSIDERATIONS WHEN FOSTER CARE AGENCY IS INVOLVED (2023).

[27] 42 U.S.C. §§ 405(j)(2)(E)(ii), 1383(a)(2)(B)(xii); *see also* 20 C.F.R. §§ 404.2030(a), 416.630(a) (2023).

[28] 42 U.S.C. §§ 405(j)(2)(E)(iii), 1383(a)(2)(B)(xiii); *see also* 20 C.F.R. §§ 404.2030(a)(4), 416.630(a)(4) (2023).

[29] SOC. SEC. ADMIN., POMS, GN 00502.159, ADDITIONAL CONSIDERATIONS WHEN FOSTER CARE AGENCY IS INVOLVED (2023).

[30] *Id.*

costs that would otherwise be paid by the state general fund. We refer to this practice as OCS's "self-reimbursing rep payee scheme."

Children sometimes arrive in OCS custody already receiving benefits. For other children, OCS identifies the child as potentially eligible and then files an initial application both for benefits and to be designated the rep payee. OCS asserts that when a minor qualifying for Social Security benefits "enters legal custody of the state and is in a paid out-of-home placement (e.g., foster care), the state always applies to become the representative payee." OCS applies to be the rep payee regardless of whether the child already has a rep payee. OCS does not investigate other rep payees or decide that it would be a more or less appropriate rep payee, because that process and decision is solely up to the SSA. While children in OCS custody are the subject of Child In Need of Aid (CINA) proceedings in superior court, which typically involve a number of participants (i.e. a judge, the child, the child's guardian ad litem, the parents, and sometimes an attorney for the child), OCS does not notify anyone when it applies to become the rep payee for a foster child or if and when it is appointed as the rep payee.

To facilitate applying for benefits, OCS has been authorized to view SSA data to determine if a child entering foster care is currently a Social Security beneficiary. In return the SSA is given access to the OCS foster care database so that it can quickly review minors' rep payee status when foster care changes occur.[31] This information sharing process is governed by several formal information sharing agreements between the SSA and the State.

Once OCS is assigned as the rep payee, it records each child's benefit payments in an individualized QuickBooks account. OCS then uses that account to

---

[31] This information sharing arrangement is part of a federal mandate to ensure identification of beneficiaries in foster care and to assist the SSA in redetermining the appropriate rep payee when children enter or leave foster care. 42 U.S.C. § 405(j)(11)(A) ("The Commissioner of Social Security shall — (i) enter into agreements with each state . . . for the purpose of sharing and matching data . . . .").

record payments for eligible expenditures. The cost of a foster child's basic needs "nearly always exceeds the amount of a monthly Social Security benefit." Any remaining costs for a child's basic needs are paid for out of the state general fund "or other eligible funding sources." For children eligible for both SSI and Title IV-E funds,[32] OCS favors having foster children receive SSI benefits and forgoes Title IV-E funding. OCS's reason for this preference is that receiving SSI also automatically makes children eligible for Medicaid[33] and other public assistance that may help children after they leave foster care or reach the age of 18.

OCS asserts that it manages each child's account to ensure that no child's resources exceed the SSI cap of $2,000 and that, when a child leaves OCS custody with funds remaining, it returns those funds to SSA for redistribution to the next rep payee. But the sample of 50 accounting records produced in response to a court order during the litigation reflects that no child's benefit money remained at the end of any given month or when the child left OCS custody. OCS does not normally provide an accounting to children about how their benefits were spent while they were in state custody. Benefit eligibility and income, if any, are discussed with children when planning for their transition out of foster care. OCS is required to and does provide an accounting to the SSA on an annual basis.

---

[32] Title IV-E funding is separate federal funding provided to states to offset foster care costs. *See* 42 U.S.C. §§ 670, 672. Title IV-E is not implicated in this case, except for one minor point. A foster child cannot receive both SSI benefits and Title IV-E funds. 20 C.F.R. §§ 416.1124(c)(12), 416.1143(b) (2023). Therefore, OCS does not claim Title IV-E funds for foster children eligible for SSI benefits because doing so, according to OCS, would result in a dollar-for-dollar reduction in the SSI benefit. And because Title IV-E funds almost always exceed the SSI benefit rate, the child's benefits would normally be reduced to zero and after 12 months at zero the benefits would purportedly be terminated. This termination does not make a beneficiary subsequently ineligible, but it does require a new benefit application to be submitted to restart benefits once Title IV-E funds are no longer being received.

[33] 20 C.F.R. §§ 416.2101-416.2176 (2023).

### B. Proceedings

#### 1. Initial action and due process litigation

The current plaintiff in this case, Z.C.,[34] represents a class of "all foster children for whom the State was appointed a[s] representative payee [for Social Security benefits]" from July 10, 2012 to October 22, 2021. Z.C. was in OCS custody starting in 2010. In 2013 Z.C. qualified for SSA benefits and OCS was appointed as her rep payee. During the time that OCS served as Z.C.'s rep payee, it received $4,445 in benefits for her. All of this money was used by OCS to pay for Z.C.'s foster care. In state fiscal year 2019, OCS was the rep payee for 140 children who received benefits. In that same year OCS received and spent almost $1,800,000 of foster children's Social Security benefits.

The initial complaint in this case was filed in 2014, and the first amended complaint was deemed filed and served in January 2016. The complaint alleged both due process and equal protection violations. The procedural due process claim alleged that OCS violated Z.C.'s rights by failing to notify her that she was entitled to benefits and that the agency was going to apply to be a rep payee for those benefits. Z.C. sought "[a]n injunction prohibiting the State from applying for Social Security benefits on a foster child's behalf or attempting to be appointed representative payee for a foster child without first providing the affected foster child with a due process[-]compliant notice." Z.C.'s equal protection claim alleged that the State treats "two different classes of foster children differently," the two classes being those children who have private rep payees and those children who have OCS as a rep payee. Z.C. asserted that the foster children with private rep payees received the direct benefit of their monthly Social Security benefits, while the foster children with OCS as a rep payee lost their benefits to the

---

[34] After the complaint in this case was filed, Z.C. was substituted as plaintiff because the original plaintiff had already aged out of OCS custody. Z.C. has also since aged out of OCS custody.

"state's coffers." Z.C.'s equal protection claim was subsequently changed to assert that OCS was treating foster children qualifying for SSA benefits differently than all other foster children in its care by "effectively charging them for their own foster care."

In addition to her constitutional claims, Z.C. also sought an "injunction requiring the State to hold in trust an amount equal to the Social Security funds the State received" as rep payee during the pendency of the case. Z.C. asked the court to require OCS to inform all beneficiaries and their respective guardians ad litem (GALs) of this suit, to give notice of their right to seek an alternate rep payee, and to release the funds held in trust to the new rep payee, if one was appointed. Alternatively, Z.C. requested disgorgement of any benefits OCS obtained as rep payee to the beneficiary in any case in which the State obtained those benefits without providing a due process-compliant notice to the children whose benefits were at issue.

In 2016 Z.C. moved for summary judgment on the due process claim, and OCS moved for summary judgment on all claims. In response the court issued an order asking the parties a series of questions about the operation of the rep payee program. Over the course of the next year the parties answered the court's questions and submitted additional argument. The court subsequently entered an order granting summary judgment to Z.C. on the due process claim.

The court held that OCS was violating foster children's state constitutional due process rights by not giving them any notice about the possibility of obtaining a rep payee other than OCS. The court found that the private interest at stake was the termination or decrease in the amount of benefits available. The court reasoned that children with a private payee may end up with greater choice in how those benefits are spent, and have an increased potential of receiving and retaining a greater amount of benefits in a given period. This is because a child with OCS as the rep payee is inevitably left with no remaining benefits because OCS spends all benefit money first, and then any remaining needs are paid for with state funds. A child with a private rep payee, on the other hand, receives the full benefit of state funds allocated to their foster

care, and also realizes the full Social Security benefit to pay for additional eligible expenses.

The court held that a foster child's interest was at risk because "[i]f foster children in the State's custody do not get notice of the State's application to be the rep payee and an explanation of the significance of such an appointment, they are less likely to understand that they may seek an alternate private payee and what the potential financial advantages of that alternative could be." The court next concluded that the burden on OCS to provide this notice would be minimal. The court reasoned that this would be one of the many "routine (albeit important)" notices that OCS must give during the life of a CINA case. The court then ordered OCS to begin providing due process-compliant notices to foster children and "other interested parties in the CINA case." The court instructed that "[t]he notice must explain the concept of a representative payee and who could be a payee . . . [and] explain the consequences of the selection of the State, rather than a private person or entity, as payee."

Five months after the court's order, OCS had not begun sending notices, so Z.C. moved the court to compel OCS to do so. The court granted the motion to compel and further refined its notice requirements. The court ordered OCS to:

> immediately provide a written notice . . . to all foster children for whom [OCS] [is] *currently* serving as the representative payee. The notice must explain the concept of a representative payee and who could be a payee and how the foster child might act to select a different payee than [OCS]. It must also explain the consequence of the selection of [OCS], rather than a private person or entity, as the payee.

The court again ordered this notice to go to the foster child and other interested parties in the CINA case, and if there were no CINA case, to "the child, the child's guardian ad litem, the child's parents if they are alive and they still have parental rights, and the child's foster parents."

OCS moved for reconsideration of this order. OCS claimed that the SSA had reviewed the court's prior order and had informed OCS that "compliance with the

[o]rder would violate federal privacy law." OCS claimed that the SSA's objection was related to the terms of the data-sharing arrangement between it and OCS and that the SSA had told OCS that it "should not comply with the order pending further legal review by federal general counsel." OCS also pointed out two errors in the court's order, namely that there is no mechanism for a child to "act to select a different payee"[35] and that there are no circumstances under which a child would be in OCS custody in the absence of a CINA case. The court denied OCS's motion for reconsideration. OCS began sending notices to all foster children for whom it served as rep payee, and to children in connection with new rep payee applications. OCS also sought a waiver from the SSA from the data-exchange restrictions so that it could "redisclose SSA data" to comply with the court's order.

One year after OCS began providing notices, the SSA denied OCS's request to "redisclose" SSA data. The SSA informed OCS that "disclosing that OCS has applied to be a minor child's representative payee, explaining the consequences of that appointment, [and] disclosing that a child receives Social Security benefits to the other parties listed in the court order . . . is not essential to determining entitlement to and eligibility for benefits." The SSA further explained that redisclosing that information is not "required by law and is not essential to the . . . program" and therefore violated the data-exchange agreements between the SSA and OCS. In response to the SSA's opinion letter, OCS stopped applying to be representative payee

---

[35]     The court, in its two orders, had described the relevant context as a minor being able to "seek an alternate private payee" or a minor being able to "act to select a different payee than [OCS]." OCS asserted that a child has no ability to "select" a payee. Instead, "[t]he person seeking to be appointed representative payee must make his or her own application to the Social Security Administration." The SSA appoints the rep payee in the child's best interests, regardless of what the child or anyone else wants. *See* 20 C.F.R. §§ 404.2021, 416.621 (2023).

for foster children that it identified as eligible for benefits via the federal data-sharing program.

At this point, OCS also filed an Alaska Civil Rule 60(b) motion to request relief from the court's notice orders. In this motion OCS argued that it was prohibited by the SSA from complying with the court's orders regarding due process notice, and that federal law preempted any state intrusion into the federal representative payee selection process. In response to OCS's and the SSA's concerns, the court granted OCS's request for relief from the judgment under Alaska Rule 60(b)(6) and modified its original orders on notice.[36] The court clarified that its original notice requirement did not require the "redisclosure" of any information obtained from the SSA. The court also clarified its notice guidance. The final order on notice stated:

> 1. When the State takes temporary or legal custody of any minor child, it shall provide a written notice (described in paragraph 2, below) to the child, the child's parents (if his or her parental rights have not been terminated), and the child's subsequently appointed GAL.
> 2. The notice shall advise that a) if the child, while in the custody of the OCS is placed in foster care and is or becomes eligible for Old-Age, Survivors, and Disability Insurance benefits or Social Security Supplemental Income benefits, then OCS will apply to the SSA [to] become the child's representative payee; b) the child or another on the child's behalf may propose an alternative representative payee to the SSA; [and] c) the financial consequences of OCS, rather than a private person, becoming the representative payee.

### 2. Preemption, equal protection, and restitution litigation

During the litigation regarding compliance with the court's notice order, the parties also litigated the remaining equal protection and restitution claims in cross-

---

[36] *See* Alaska R. Civ. P. 60(b)(6) (allowing court to relieve party from final judgment for "any other reason justifying relief from the operation of the judgment").

motions for summary judgment. This included litigation about whether the court's notice order was preempted by federal law.

The court first decided that federal law did not preempt its final notice order, explaining that the court found "a violation of due process rights guaranteed by Alaska's constitution," that the Social Security Act "does not forbid the notice" ordered, and that the Act did not "fully and exclusively occup[y] the field of notice to a Social Security beneficiary."

The court then granted summary judgment to OCS on the equal protection claim. The court explained that for OCS to have violated equal protection, it must have "misused" the benefits. It further explained that federal law preempts any effort by state courts to "dictat[e] how a state agency like OCS may exercise its duties and discretion as a foster child's representative payee." And it pointed out that if a state court cannot make a misuse finding, then it similarly cannot find an equal protection violation.

In the alternative, the court conducted an equal protection analysis. In that analysis the court held that Z.C. had failed to identify two groups of people that were similarly situated but treated differently. The court held that foster children eligible for Social Security benefits are not similarly situated with other foster children because the former "receive[] those benefits pursuant to a complex set of eligibility rules and requirements concerning the use of the benefits" while the latter are "not subject to those rules."

After deciding for OCS on the equal protection claim, the court refused Z.C.'s request to create a trust or "disgorge" the benefit money to the children. The court concluded that neither a constructive trust nor disgorgement was appropriate because OCS had not been unjustly enriched. This ultimately resulted in the court determining that OCS's "systemic lawful use of federal funds is [not] inequitable such that disgorgement or an equivalent remedy is required."

But the court took one additional action related to Z.C.'s due process claim. Based on its determination that there had been a due process notice violation, the court suggested awarding nominal damages to the class. The court invited additional briefing on this issue. Neither party filed any additional argument about nominal damages.

In October 2021 the court entered its final judgment. The court decided in favor of Z.C. on the due process notice claim, and found in favor of OCS on the restitution and equal protection claims. The court also ordered nominal damages of $30 to each member of the class. The final judgment "permanently enjoined [OCS] from violating the state due process rights of foster children . . . [by applying to be the rep payee] without the notice described by [its previous] Order[s]." Both parties now appeal.

### 3. Appeals

OCS raises two points as the appellant. First, OCS argues that the notice the court ordered conflicts with federal law and is therefore preempted. Second, OCS argues that even if the notice requirement is not preempted, foster children have no constitutionally protected right to a certain payee that might use their benefits in a certain manner.

Z.C. raises three points as the cross-appellant. Z.C. argues, first, that the court erred by rejecting the equal protection argument; second, that the court erred by holding that federal law preempted the equal protection argument; and third, that the court erred by refusing to order disgorgement or some other similar restitution remedy for OCS's due process notice violation. Various children's advocacy groups filed a brief as amici curiae in support of Z.C. We thank the parties and amici for their thorough briefing and thoughtful arguments.

## III. STANDARD OF REVIEW

We review due process, equal protection, and preemption claims de novo, and will "adopt the rule of law that is most persuasive in light of precedent, reason, and

policy."[37]  We review decisions on equitable remedies for abuse of discretion, but will "review de novo any underlying questions of law and the application of law to facts."[38]

## IV. DISCUSSION

### A. Z.C.'s Due Process Claim And The Court's Notice Order Are Not Preempted.

OCS argues that Z.C.'s due process claim and the court's notice order are barred by both field and conflict preemption.  OCS asserts that "[t]he representative payee selection program . . . is a 'field,' fully and exhaustively governed by federal statutes and regulations, administered by a federal agency, with nationwide uniformity."  OCS further contends that "Congress passed a detailed statute specifying *exactly* what notice should be provided, the content of the notice, and limiting to whom it should be provided" (emphasis added), and that those statutory terms limit the notice that may be required in any and all contexts.  We disagree.

Field preemption exists where "the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance."[39]  "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the

---

[37]     *Anderson v. Alaska Hou. Fin. Corp.*, 462 P.3d 19, 25 (Alaska 2020) (quoting *Dennis O. v. Stephanie O.*, 393 P.3d 401, 405-06 (Alaska 2017)); *Watson v. State*, 487 P.3d 586, 589 (Alaska 2021); *Andrews v. Alaska Operating Eng'rs-Emps. Training Tr. Fund*, 871 P.2d 1142, 1144 (Alaska 1994); *State, Dep't of Health & Soc. Servs. v. Planned Parenthood of Alaska, Inc.*, 28 P.3d 904, 908 (Alaska 2001).

[38]     *In re Est. of Fields*, 219 P.3d 995, 1002 (Alaska 2009).

[39]     *Arizona v. United States*, 567 U.S. 387, 399 (2012) (Souter, J., dissenting) (citing *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 115 (1992)).

same subject.' "[40]   This includes state laws that supplement or work parallel to the federal system.[41]

While we agree that the SSA benefit regulations are comprehensive, we do not agree that field preemption so broadly precludes challenges against how a state agency decides to utilize a federal scheme of regulations.   The action that Z.C. challenges on due process grounds is not OCS's appointment as rep payee, nor the rep payee appointment process itself; nor does Z.C. challenge the adequacy of the SSA's notice regarding these processes.   Instead, the state action Z.C. challenges is OCS's systematic practice of applying to be rep payee for *all* foster children in its care *and then* invariably using SSA benefits to reimburse itself the cost of foster care, without telling *anyone* that it is doing so.   These are not actions of the SSA, and they are not directed or mandated by SSA regulations.   The superior court's scrutiny of OCS's systematic utilization of the rep payee system to reimburse its foster care costs does not intrude into an occupied field.

The "field" that the SSA has occupied is the investigation and appointment of rep payees for minor beneficiaries, and the associated notice and appeal rights, within the larger administration of the benefit program.   And while OCS is correct that state courts have limited authority in this area,[42] here the superior court's notice order does not intrude into this field.   Instead, the notice order simply requires OCS to *tell* the children in its custody how it, a state agency, intends to apply for and utilize qualified children's federal entitlements, and to notify the children of the financial ramifications

---

[40]   *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

[41]   *Id.* at 400-01.

[42]   For example, a state court could not prevent OCS from applying to be a rep payee, could not require the SSA to provide additional or different notice during the rep payee selection process, and could not order OCS to spend the benefits differently. These actions would all clearly be preempted. *See C.G.A. v. State*, 824 P.2d 1364, 1367 (Alaska 1992).

of having OCS as a rep payee and that the children or another on their behalf "may propose an alternative representative payee to the SSA."[43]

OCS cites to *Arizona v. United States* to support its argument that "[s]tate law simply has no part in the 'harmonious whole' of the Social Security representative payee regulatory scheme."[44] But our reading of *Arizona* convinces us that this situation is different. There, the federal government created a complete statutory scheme that balanced determinations about who should face criminal liability in certain contexts.[45] That balance focused on criminalizing employers' hiring of undocumented workers rather than imposing sanctions on the undocumented employees.[46] An Arizona law then attempted to impose criminal liability on those undocumented workers.[47] The Court held that a preemptive inference was "drawn — not by federal inaction alone, but

---

[43] This conclusion is supported by decisions of other courts that have recognized that the SSA allows for some state court involvement, particularly around issues of rep payee misuse and state statutes that criminalize benefit theft. *See, e.g.*, *Grace Thru Faith v. Caldwell*, 944 S.W.2d 607, 610-11 (Tenn. App. 1996) (holding language of Social Security Act "clearly indicates that a claim of payee misuse of funds can be addressed outside the SSA's administrative procedures"); *Jordan v. Heckler*, 744 F.2d 1397, 1399 (10th Cir. 1984) (holding rep payee misuse of funds was not "initial determination" and therefore did not trigger federal hearing, but misuse claims "could however go against the representative as an individual with state law remedies available"); *State v. Wallace*, 828 N.E.2d 125, 129-30 (Ohio App. 2005) (holding that prosecution of a rep payee under state theft statute "was not preempted by federal law"); *Commonwealth v. Morris*, 575 A.2d 582, 586 (Pa. Super. 1990) ("We conclude that the Social Security Act itself as well as its legislative history make clear that the federal government did not intend to dominate the field of public welfare to the exclusion of the states. Hence, the argument that Congress intended to preclude state prosecutions for behavior under state criminal statutes constituting theft of Social Security benefits must fail.").

[44] 567 U.S. 387, 401 (2012).

[45] *Id.* at 400-06.

[46] *Id.* at 404-06

[47] *Id.* at 403-04.

from inaction joined with action."[48]  The Arizona law was struck down as interfering with the balance the federal law struck regarding who should face liability.[49]

Here the SSA regulations do not contemplate an intent to prevent a state agency serving as rep payee from telling its beneficiaries how it will utilize the federal entitlement system.  If anything, the regulations are ambivalent about what a rep payee should communicate to the beneficiary.  The SSA regulations are directed toward the investigation and appointment of a rep payee, notice of that appointment, and assurance that benefits are spent for the beneficiary's "current maintenance."[50]  Unlike in *Arizona*, here there is no concerted inaction joined with action.

OCS also argues that the court's notice order directly conflicts with federal policy regarding rep payee selection and notice because it "encourag[es] appointment of a non-OCS payee in hopes that a child might receive more resources," which does not advance Congress's purpose to ensure that the beneficiary's best interests are met. We see no conflict here.

Conflict preemption exists where state laws "conflict with federal law."[51] "This includes cases where 'compliance with both federal and state regulations is a physical impossibility,' and those instances where the challenged state law 'stands as

---

**48**    *Id.* at 406-07 (citing *Puerto Rico Dep't of Consumer Affs. v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988)).

**49**    *Arizona*, 567 U.S at 406-07.

**50**    *See* 20 C.F.R. §§ 404.2040, 416.640 (2023); *see also* 20 C.F.R. §§ 404.2001-404.2065, 416.601-416.665 (2023).

**51**    *Arizona*, 567 U.S. at 399 (citing *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)).

an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' "[52]

Nothing in the court's notice order directly conflicts with SSA regulations. Nor is it a physical impossibility for OCS to follow both the federal rules regulating SSA benefits and rep payees, and the court's notice order. An order requiring OCS to tell foster children and other associated parties what it will do if the child is eligible for benefits and OCS is appointed as a rep payee does not impact the SSA's rep payee scheme in the slightest. Compliance with this order does not intrude on the rep payee investigation, decision, or notice. Nor does it attach the benefits, or otherwise direct OCS how it can spend them. Moreover, we see no merit in OCS's argument that notifying a foster child of the financial consequences of having OCS as a rep payee versus having someone else as a rep payee somehow conflicts with Congress's goal of ensuring the beneficiary's best interests. If anything, such a notice *assists* the SSA in making the best rep payee decision possible by informing interested parties that others, outside of OCS, may apply to become a child's rep payee. This in turn may lead to a more thorough investigation and allow the SSA to make a more informed rep payee appointment decision in the child's best interests.[53] This is hardly in conflict with the purpose and objectives of the benefits program. We conclude that neither Z.C.'s due process argument nor the court's resulting order is preempted.[54]

---

[52] *Arizona*, 567 U.S. at 399 (first quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963); and then quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

[53] *See* 20 C.F.R. §§ 404.2021, 416.621 (2023) (stating SSA appoints rep payee in child's best interests regardless of child's preferences).

[54] OCS has argued that the court's original notice order conflicted with federal privacy law and violated OCS's data exchange agreement with the SSA. But OCS indicates that the court's final order "resolved the conflict with the federal privacy agreements."

**B.      OCS Must Inform Foster Children Of Its Systematic Self-Reimbursing Representative Payee Scheme.**

At its most basic level, procedural due process is about fairness.[55]  It is concerned with the manner in which a government accomplishes its objectives when those objectives risk depriving a person of life, liberty, or property.[56]  To alleviate the risk that a person is wrongly or unfairly deprived of life, liberty, or property, state actors must adequately inform affected persons of measures or actions by the state that may impact them and give those persons a meaningful opportunity to participate in the process.[57]  What process is required, however, is "flexible and calls for such procedural protections as the particular situation demands."[58]  These protections span the spectrum from simple notice, to the right to meaningfully participate and present evidence during a hearing before an impartial factfinder, to the right to confront and cross-examine witnesses.[59]

---

[55]      *See Copeland v. Ballard*, 210 P.3d 1197, 1201 (Alaska 2009) ("Due process includes the right to . . . proceedings that are fair and that have the appearance of fairness." (citing *State v. Lundgren Pac. Constr. Co.*, 603 P.2d 889, 895-96 (Alaska 1979))).

[56]      *Doe v. State Dep't of Pub. Safety*, 444 P.3d 116, 124 (Alaska 2019).

[57]      *See Burns v. Burns*, 466 P.3d 352, 360 (Alaska 2020) ("Due process requires a 'meaningful' opportunity to be heard." (quoting *Anderson v. Alaska Hous. Fin. Corp.*, 462 P.3d 19, 30 (Alaska 2020))); *Copeland*, 210 P.3d at 1201 ("[P]rocedural due process . . . requires 'notice and opportunity for hearing appropriate to the nature of the case.' " (alteration in original) (quoting *Carvalho v. Carvalho*, 838 P.2d 259, 262 (Alaska 1992))).

[58]      *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)); *see also Copeland*, 210 P.3d at 1201 (stating that process must be "appropriate to the nature of the case").

[59]      *See, e.g.*, *Weathers v. Weathers*, 425 P.3d 131, 138 (Alaska 2018) (discussing cases on importance of notice); *Anderson*, 462 P.3d at 30-34 (discussing importance of "meaningful" opportunity to be heard); *Copeland*, 210 P.3d at 1201 (discussing right to proceedings that are both "fair and that have the appearance of

To determine whether a government action impermissibly denies a person procedural due process, we apply the framework outlined by the United States Supreme Court in *Mathews v. Eldridge*.[60] As that court explained,

> the specific dictates of due process generally require[] consideration of . . . the private interest that will be affected by the official action; . . . the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[61]

Not all private interests implicate procedural due process. Instead, the affected private interest must be a non-trivial protected interest.[62] A classic example of a non-trivial protected interest is ownership of real property.[63] But we have also recognized that once a property entitlement "grounded in" law is found, the "types of interests protected as 'property' are varied and, as often as not, intangible, relating 'to the whole domain of social and economic fact.' "[64] This approach recognizes that

---

fairness"); *Thorne v. State, Dep't of Pub. Safety*, 774 P.2d 1326, 1332-33 (Alaska 1989) (discussing civil litigant's due process right to "confront and cross-examine witnesses").

[60]     *Titus v. State, Dep't of Admin., Div. of Motor Vehicles*, 305 P.3d 1271, 1280 (Alaska 2013) (citing *Mathews*, 424 U.S. at 339-49).

[61]     *Mathews*, 424 U.S. at 335.

[62]     *See City of Homer v. Campbell*, 719 P.2d 683, 684 (Alaska 1986) ("We have stated that once a due process claim is raised, it must first be determined 'whether there is a deprivation of an individual interest of sufficient importance to warrant constitutional protection.' " (quoting *Herscher v. State, Dep't of Com.*, 568 P.2d 996, 1002 (Alaska 1977))).

[63]     *Anderson*, 462 P.3d at 27 ("If a property interest in a stove or stereo can trigger due process protections, surely an interest in real property can as well.").

[64]     *City of Homer*, 719 P.2d at 684-85 (quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982)).

constitutionally protected "property interests" can also encompass the intangible rights and privileges associated with the property at issue. We have previously recognized "property" interests in such things as licenses, the ability to engage in particular application processes, and the ability to engage in an economic endeavor, business pursuit, or chosen profession.

For example, in *City of Homer v. Campbell* we recognized that a statutorily created right to a zoning change contract extended to a related and protectable proprietary interest in a business enterprise that was created pursuant to a contracted zoning change.[65] There we held that the landowner could not be deprived of either his proprietary interest in the zoning contract or the attendant business enterprise without due process.[66] Meanwhile in *Wilkerson v. State* we recognized a property-adjacent interest in the "pursuit of an economic endeavor" even though in that case we declined to impose additional procedural protections for this "minimal" private interest given the burden imposed on the government by the requested additional protection.[67] And in *Herscher v. State* we recognized a "proprietary interest in [a] hunting guide license" and noted that "[i]t has long been recognized that an interest in a lawful business is a species of property entitled to the protection of due process."[68]

---

[65]     *City of Homer*, 719 P.2d at 685.

[66]     *Id.*

[67]     *See Wilkerson v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 993 P.2d 1018, 1023-24, 1026 (Alaska 1999); *cf. State, Dep't of Transp. & Lab. v. Enserch Alaska Constr., Inc.*, 787 P.2d 624, 632 (Alaska 1989) (recognizing interest in an economic endeavor within a particular industry as an "important" right for equal protection purposes).

[68]     *Herscher v. State, Dep't of Com.*, 568 P.2d 996, 1002 (Alaska 1977) (quoting *Frontier Saloon, Inc. v. Alcoholic Beverage Control Bd.*, 524 P.2d 657, 659-60 (Alaska 1974)).

There we recognized that a property interest in a license also included the associated private interest in using that license to run a business.[69]

The private interest we recognize in this case falls into this category of intangible rights and privileges. As further explained below, while OCS's self-reimbursing rep payee scheme does not directly risk the deprivation of children's Social Security benefits themselves, it does create a risk of deprivation of the intangible rights and privileges that foster children have by virtue of the intersection between their property interests in SSA benefits and the state foster care stipend.[70]

In deciding this issue, the superior court identified the private interest at issue as a possible "termination or decrease in the amount of benefits" received by or on behalf of a beneficiary. The court also cited approvingly to *In re Ryan W.* as recognizing a private interest in the "free use" of benefits.[71] It finally noted that we have underscored the importance of due process protections for individuals who receive public benefits based on "constitutional mandates . . . embodied in the federal and state regulations governing administration of the Medicaid program," which require notice when an agency contemplates the termination of or reduction in a recipient's public benefits.[72]

OCS argues that applying to become a child's rep payee and then spending those benefits consistent with federal guidance "create[s] no risk of deprivation of the actual constitutionally protected interest in the benefits themselves." It additionally

---

[69] *See id.*

[70] *See* 7 Alaska Administrative Code (AAC) 53.030(a) (requiring OCS to "pay a base rate for foster care for a child placed by the department"); *cf. Heitz v. State, Dep't of Health & Soc. Servs.*, 215 P.3d 302, 306 (Alaska 2009) (recognizing foster parents have "a protected property interest" in foster care reimbursement payments).

[71] *In re Ryan W.*, 76 A.3d 1049, 1069 (Md. 2013).

[72] *See Baker v. State, Dep't of Health & Soc. Servs.*, 191 P.3d 1005, 1009 (Alaska 2008) (citing *Goldberg v. Kelly*, 397 U.S. 254, 267-68 (1970)).

rejects the idea that children have any right to the "free use" of their benefits because children "never receive their benefits directly." OCS further argues that the interest the superior court actually identified was an interest in being put in a "financially advantageous" position by having a non-OCS rep payee. Overall OCS asserts that none of these interests "rise to the level of a constitutionally protected interest."

We agree with OCS that its systematic practice of using Social Security benefits to cover expenses normally borne by the State does not attach or reduce the amount of the benefits themselves. This practice, which is allowable under SSA regulations and has been held not to violate the Act's anti-attachment clause, risks little direct deprivation of the benefits.[73] We also agree with OCS that foster children have no guaranteed right to receive the full amount of both their Social Security benefits and the state foster care stipend. The fact that these two entitlements overlap to the financial advantage of OCS does not create a guaranteed "financial maximization" right for the foster children. We acknowledge that the United States Supreme Court has held that a rep payee "serves the beneficiary's interest by seeing that basic needs are met, not by maximizing a trust fund attributable to fortuitously overlapping state and federal grants."[74] But we disagree that OCS's systematic self-reimbursing rep payee scheme implicates no constitutionally protected interest whatsoever.

Although foster children lack a guaranteed right to receive any amount of overlapping state and federal funds, we recognize that they have a sufficient interest in each of those funds such that they are entitled to notice of a systematic state practice likely to impact the amount of those funds they will benefit from, and of their ability to nominate a rep payee other than OCS. Regarding foster children's interest in state foster care payments, we note that we have previously acknowledged, in *Heitz v. State*, the

---

[73] *See Wash.State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler* (*Keffeler II*), 537 U.S. 371, 389-90 (2003).

[74] *Id.* at 390.

property interest that foster parents hold in such foster care payments as reimbursements for amounts expended for foster children in their care.[75] In *Heitz* we held that foster parents have a property interest in state foster care payments such that OCS was required to provide notice before recouping alleged overpayments.[76] We left open in *Heitz* the question whether others may have an interest in state foster care payments protected by the due process clause.[77] In this context, we hold that involved foster children have a property interest in each of the streams of benefits — state foster care payments and Social Security benefits — such that the foster children are entitled to notice of OCS's systemic practice impacting the amount of funds the children may benefit from, as well as notice of their ability to nominate a rep payee other than OCS for the SSA's consideration.[78] This holding is consistent with those of other courts that have recognized children's property interests in the context of foster care payments and other forms of public assistance, which may give rise to due process rights.[79]

---

[75]     *Heitz*, 215 P.3d at 305-08.

[76]     *Id.* at 305-06 (citing AS 47.14.100(b); 7 AAC 53.020). AS 47.14.100(b) authorizes OCS to "pay the costs of maintenance that are necessary to assure adequate care of the [foster] child"; 7 AAC 53.020 provides, "Subject to appropriation, and unless another source of payment is available from or through the department for the child's care, the department will provide payment for a child committed to the custody of the state . . . ."

[77]     *Heitz*, 215 P.3d at 307 n.20.

[78]     We recognize that the superior court's order requires notice not just to children qualifying for the Social Security benefits at issue, but to all children entering its custody. Our holding should not be interpreted to broaden the interests of those who do not qualify to benefit from both streams of funding; rather, we recognize that the superior court ordered the notice as it did so as to avoid any violation of federal law as a result of the data-sharing agreement between OCS and the SSA.

[79]     *See Sockwell v. Maloney*, 431 F. Supp. 1006, 1012 (D. Conn. 1976) ("[O]nce a child is found in need of foster care and is placed in a foster home, the child acquires a property interest in foster care payments protected by the due process clause

OCS readily admits that, for all benefit-eligible children in its custody, it *always* applies for benefits, and *always* applies to become the rep payee. And the record reflects that once assigned as the rep payee, OCS *always* offsets Social Security benefit money against its foster care costs. OCS further admits that it *never* provides any notice to anyone regarding these actions.[80] Through its systematic application to serve as rep payee for children in its custody, OCS places itself in the position to be able to offset its foster care costs with the Social Security benefits. A foster child with a non-OCS rep payee, on the other hand, is likely to enjoy the benefit of *both* the foster care stipend and the Social Security benefits, because the benefits paid to a private rep payee may not be attached by OCS or any other entity in order to reimburse the State for maintenance costs.

---

of the Fourteenth Amendment."), *aff'd*, 554 F.2d 1236 (2d Cir. 1977); *Youakim v. McDonald*, 71 F.3d 1274, 1289, 1291 (7th Cir. 1995) (holding foster children "have a legitimate claim of entitlement" to foster care benefits; therefore "due process requires that the governmental agency provide current recipients the opportunity to establish eligibility under the new standards *before* their benefits may be eliminated" (emphasis in original)); *Kelly ex rel. Kelly v. Heckler*, 740 F.2d 881, 882 (11th Cir. 1984) (per curiam) (stating foster care payments at issue in case were "the property of the foster children"); *Frost v. Weinberger*, 515 F.2d 57, 68 (2d Cir. 1975) (due process requires SSA provide "full post-reduction hearing" to children entitled to survivors' benefits under Social Security Act); *In re Gault*, 387 U.S. 1, 13, 27-28 (1967) ("[N]either the [Due Process Clause of the] Fourteenth Amendment nor the Bill of Rights is for adults alone." (first citing *Kent v. United States*, 383 U.S. 541 (1966); then citing *Haley v. Ohio*, 332 U.S. 596 (1948); and then citing *Gallegos v. Colorado*, 370 U.S. 49 (1962))).

[80] We note, as OCS asserts, that notice of rep payee appointment is controlled by federal law. 42 U.S.C. §§ 405(j)(2)(E)(ii), 1383(a)(2)(B)(xii); 20 C.F.R. §§ 404.2030(a) (2023), 416.630(a) (2023). The practical result of the notice regulations is that when OCS is appointed as a rep payee, only OCS is noticed. *See* 20 C.F.R. § 404.2030(a) (2023) ("If you are under age 15, an unemancipated minor under the age of 18, or legally incompetent, our written notice goes to your legal guardian or legal representative."); 20 C.F.R. § 416.630(a) (2023) (same).

This makes knowledge of one's entitlement to benefits, and the opportunity and ability to nominate a private rep payee, more than just a theoretical benefit for foster children qualifying for Social Security benefits. For these vulnerable and often disabled, orphaned, or traumatized children in foster care, there must be some property interest in the systems that are meant to support and maintain them.[81]

But OCS's systematic practice of always applying to be the rep payee for children in its custody and invariably using all of the Social Security benefit money to reimburse its foster care costs, without providing notice to anyone, creates a high risk of erroneously depriving these children of their ability to understand the benefits they are entitled to and to nominate a private rep payee that will not systematically offset one stream of benefits against another. Indeed, the record demonstrates that the involved foster children are often entirely unaware of their entitlement to Social Security benefits, OCS's receipt of benefits as their rep payee, or OCS's use of those benefits for self-reimbursement until they are transitioning out of OCS custody.

OCS is correct that its self-reimbursing rep payee scheme is permitted by SSA regulations. In light of the relevant precedent, we do not question OCS's ability to institute such a scheme.[82] But it also strikes us as fundamentally unfair for a state agency to take financial advantage of these systems without, at a minimum, telling interested parties that it is doing so. And while the right to know of one's entitlement and receipt of Social Security benefits and to nominate a private rep payee is a relatively limited interest,[83] it is enough to justify the minimum notice requirement ordered by the

---

[81] *See City of Homer v. Campbell*, 719 P.2d 683, 684-85 (Alaska 1986) (explaining interests protected as "property" relate "to the whole domain of social and economic fact" (quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982))).

[82] *See Keffeler II*, 537 U.S. 371, 389-91 (2003).

[83] This interest includes such things as being able to influence what the rep payee spends the money on, the ability to cultivate a non-OCS rep payee, an interest in

superior court. The Alaska Constitution requires that OCS institute this practice in the light of day, with all interested parties informed of what OCS plans to do if it is appointed as a rep payee.

We are careful to point out that this private interest is limited to this context. It is created by the overlap of the entitlement programs and OCS's unique position and ability to take financial advantage of that overlap. This decision does not extend associated rights or interests to children not subject to the overlapping nature of Social Security benefits and the state foster care stipend, or to children not subject to OCS's self-reimbursing scheme.

This leaves only the final factor of the *Mathews* test unaddressed: the government's interest in continuing to employ its self-reimbursing rep payee scheme without notice, and the burden of notifying interested parties of this practice.[84] We see no legitimate reason for OCS to continue its practice without providing notice to youth in its custody. We also agree with the superior court that providing the notice it ordered imposes only a "minimal" burden. As the court recognized, OCS is obligated "to give parties to a CINA case notice of a plethora of rights." This additional notice would be one of the many "routine (albeit important)" notices.

OCS argued before the superior court that providing the required notice would impose a significant burden, but abandoned that argument on appeal. Given that,

---

the right to propose to the SSA a different rep payee, the ability of another interested party to submit a rep payee application, and a private interest in pursuing action to alter the financial ramifications of an OCS versus non-OCS rep payee assignment. These rights are of course limited by the fact that the SSA ultimately makes the decision who to select as a rep payee. *See* 20 C.F.R. § 416.621 (2023).

[84]    *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

we see no reason to question the superior court's findings on this point.[85] We therefore hold that OCS must provide the notice ordered by the superior court if it wishes to continue implementing its self-reimbursing rep payee scheme.

### C. Z.C.'s Equal Protection Claim Is Preempted.

The superior court held that Z.C.'s equal protection claim was preempted. The court, citing *In re Ryan W.*[86] and *C.G.A. v. State*,[87] concluded that state courts cannot dictate "how a state agency like OCS may exercise its duties and discretion as a foster child's representative payee." The court also stated that an equal protection violation would "surely" also be a "misuse" of the benefits.

Z.C. argues that the superior court misinterpreted *In re Ryan W.* and *C.G.A. v. State*. Z.C. also disagrees with the premise that to substantiate an equal protection claim, a state court must by definition find that a rep payee was misusing benefits. Z.C. points out that "misuse" of benefits is a term of art that does not apply here.[88] While we agree with Z.C. that OCS need not be misusing the benefits to substantiate an equal protection violation, we nevertheless hold that Z.C.'s equal protection claim is preempted.

---

[85] Similarly, the court also awarded each class member $30 in nominal damages. Neither party responded to the superior court's invitation to provide briefing on nominal damages; nor did either party raise an argument on appeal about the amount of the nominal damages award. Given this, we do not address the award's validity. *Gunderson v. Univ. of Alaska, Fairbanks*, 902 P.2d 323, 327 n.5 (Alaska 1995) (holding argument not raised before trial court or not included in statement of points on appeal will not be considered on appeal); *City of Fairbanks v. Rice*, 20 P.3d 1097, 1106 (Alaska 2000) (holding that issue was so "sparely briefed" as to be waived).

[86] 76 A.3d 1049 (Md. 2013).

[87] 824 P.2d 1364 (Alaska 1992).

[88] 42 U.S.C. § 405(j)(9) (defining "misuse" as when "the representative payee receives payment . . . for the use and benefit of another person and converts such payment, or any part thereof, to a use other than for the use and benefit of such other person").

The essence of Z.C.'s equal protection claim is that OCS's self-reimbursing rep payee scheme makes benefit-eligible foster children "pay for their own care," thereby impermissibly treating them differently from all other foster children. But what a rep payee is authorized to do with benefit money is squarely controlled by federal regulations. As described in the facts section above, federal benefit money is *required* to be treated differently than other types of money the child might have or be eligible for.[89] In addition, federal benefit money is expressly intended for a beneficiary's "current maintenance,"[90] and this is exactly what OCS is spending the money on.

OCS has consistently argued that the benefit money is being utilized only for authorized uses. Z.C. also insists that none of its arguments are based on a theory that OCS is misusing the benefits. If these two assertions are true, Z.C. is asking us to rule that *this* specific manner of spending the benefit money, while allowable under the federal regulations, simultaneously violates the Alaska Constitution. But as the United States Supreme Court explained, the Social Security Agency Commissioner has decided that "a representative payee serves the beneficiary's interest by seeing that basic needs are met, not by maximizing a trust fund attributable to fortuitously overlapping state and federal grants."[91] We made a similar observation in *C.G.A. v. State*, noting that "both federal and state law allow the state to become the [rep payee] . . . and allow the state to spend [the] social security survivor's benefits on any expense authorized by federal law."[92]

A contradictory ruling from this court would intrude on the SSA's authority to dictate what Social Security benefits can and cannot be used for, and would

---

[89]   *See* 20 C.F.R. §§ 404.2040, 416.640 (2023).

[90]   20 C.F.R. §§ 404.2040, 416.640 (2023).

[91]   *Keffeler II*, 537 U.S. 371, 390 (2003).

[92]   824 P.2d 1364, 1369 (Alaska 1992).

directly conflict with the accomplishment and execution of the full purposes of the SSA benefit program. It would effectively direct OCS that it could not spend federal benefit money on certain current maintenance of foster children. Such a ruling would be preempted.

Z.C. then argues that a preemption ruling here would give OCS unfettered discretion to facially discriminate as a rep payee as long as it does not misuse the benefits. This would then leave foster children with "no ability to vindicate their state constitutional rights." We disagree.

Our narrow preemption holding today is limited to Z.C.'s articulated equal protection violation: namely, that a self-reimbursing rep payee scheme, applied evenly to all children with an OCS rep payee, violates equal protection. While this specific claim is preempted, it does not follow that all equal protection claims would also be preempted. We disagree with the superior court's assertion that a rep payee must be misusing the benefit money to substantiate an equal protection violation, but nevertheless hold that the equal protection claim brought by Z.C. is preempted.

### D. Z.C.'s Proposed Remedies Are Preempted.

After prevailing on its due process notice claim, Z.C. requested "either the creation of a trust that should hold all of the Social Security funds received by OCS for a foster child for whom it was a representative payee or the disgorgement of those monies directly to each child." Z.C. claimed that OCS was unjustly enriched when it carried out its self-reimbursing rep payee scheme without noticing anyone. The court, relying on *Ware v. Ware*,[93] rejected Z.C.'s request and held that Z.C. had failed to establish the third element necessary for the requested remedy — unjust enrichment. OCS agrees that Z.C. failed to establish unjust enrichment, and that ordering either remedy of disgorgement or creation of a constructive trust is preempted by federal law.

---

[93] 161 P.3d 1188 (Alaska 2007).

We agree that OCS was not unjustly enriched so as to support the requested remedies. And in any event, disgorgement of Social Security benefit money directly to the children, or ordering OCS to put Social Security benefit money into a constructive trust, both constitute impermissible attachments on federal benefit money and are preempted by federal law.

A constructive trust is "an equitable remedy that becomes available upon clear and convincing proof that a party holds a property interest 'by reason of unjust, unconscionable, or unlawful means.' "[94] Similarly, disgorgement is "an equitable remedy which requires a defendant to give up an amount of money equal to the defendant's unjust enrichment."[95] Equitable remedies are generally only available when there is no adequate remedy at law.[96] Creation of a constructive trust and disgorgement both require a defendant to be *unjustly* enriched.[97]

In order to prove unjust enrichment, a party must show "(1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) acceptance and retention by the defendant of such benefit under such circumstances that it would be inequitable for him to retain it without paying the value thereof."[98] We agree with the superior court that the third element is not met.

---

[94] *Gold Dust Mines, Inc. v. Little Squaw Gold Mining Co.*, 299 P.3d 148, 160 (Alaska 2012) (quoting *Riddell v. Edwards*, 76 P.3d 847, 852 (Alaska 2003)).

[95] *Peter v. Progressive Corp.*, No. S-11416, 2006 WL 438658, at *7 (Alaska Feb. 22, 2006) (citing *Harris v. Physicians Mut. Ins. Co.*, 240 F. Supp. 2d 715, 723 (N.D. Ohio 2003)). S*ee generally* RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 51 (AM. L. INST. 2023) (discussing disgorgement).

[96] *Knaebel v. Heiner*, 663 P.2d 551, 553 (Alaska 1983).

[97] *Rausch v. Devine*, 80 P.3d 733, 744 (Alaska 2003); *Peter*, 2006 WL 438658, at *7; RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 51 & cmt. a (AM. L. INST. 2023).

[98] *Ware*, 161 P.3d at 1197.

When OCS is appointed as a rep payee it takes on the duties and responsibilities of that appointment.[99] It then lawfully uses the benefit money to pay for the care and maintenance of the child in its care.[100] The fact that OCS is able to take advantage of this federal benefit scheme to achieve cost savings is not in itself inequitable. Were OCS misusing the benefit money in order to effectuate this cost savings, it would likely constitute unjust enrichment. But Z.C. has disclaimed any misuse, and the SSA allows state agency rep payees to self-reimburse in this manner.[101] Therefore, we cannot conclude that this use is inequitable so as to justify restitution. OCS *spending* the money for the current maintenance of the foster children is not the same as OCS *taking* the money for other uses, even when OCS gains a relative cost savings due to the overlapping nature of the federal and state entitlement programs.

Even were the elements of unjust enrichment met, Z.C.'s proposed solutions are preempted. In *C.G.A. v. State* we addressed a similar situation.[102] There, the superior court had ordered a non-custodial parent serving as a rep payee to remit an amount of money equal to the benefit amount to the state as a child support payment.[103] In reversing we noted that a child support order was a "legal process" that "attached [the] social security benefits."[104] Similarly, a court ordering that a rep payee must disgorge benefit money, or place benefit money in a constructive trust, ostensibly to be saved or spent differently, would constitute a legal process impermissibly attaching the

---

[99] *See* 20 C.F.R. §§ 404.2035, 416.635 (2023).

[100] *Keffeler II*, 537 U.S. 371, 389-91 (2003).

[101] *Id.*

[102] 824 P.2d 1364 (Alaska 1992).

[103] *Id.* at 1365.

[104] *Id.* at 1367.

benefits.[105] In addition, disgorging benefit money back to the children, or creating a trust to do the same, would directly conflict with goals of the rep payee system.

The SSA has decided that certain beneficiaries need a rep payee and cannot receive their benefits directly. The SSA has also decided that the rep payee, not a state court, decides how to best spend that money. Any order from this court to the contrary would be preempted. Given that the superior court here had no authority to attach the benefits or interfere with the rep payee system in the manner proposed, the court was correct to reject these proposed remedies.

## V. CONCLUSION

The superior court's orders in this case are AFFIRMED.

---

[105] *See id.*; 42 U.S.C. § 407(a).

CARNEY, Justice, concurring.

Because federal statutes and governing regulations entirely control the process of selecting a representative payee for a child's Social Security benefits,[1] I must join the court's decision today — harsh as its result may be. As the court correctly concludes, no state can place additional restrictions or qualifications on that process.

I observe, however, that OCS's treatment of children's Social Security benefits differs from its treatment of other funds to which children in its custody are entitled. By statute, the Alaska legislature has directed that children's Permanent Fund Dividends must be held in trust for them until they are released from custody.[2] Another statute requires dividends from Alaska Native corporations to be saved for the children's benefit while they are in state custody.[3] And because regulations prohibit foster parents from spending wages earned by children,[4] OCS's policy is to establish a trust or bank account for a child's income.[5] These directives reinforce the legislative policy undergirding the entire CINA statutory framework: that the best interests of the children are paramount.[6]

As the issue of states reimbursing themselves from children's Social Security benefits has become more widely recognized, a number of state legislatures have acted to prohibit or restrict the practice. At last count, 14 states and the District of

---

[1]     42 U.S.C. §§ 405(j), 1383(a)(2); 20 C.F.R. §§ 404.2020-.2021, 416.620-.621.

[2]     AS 47.10.115.

[3]     AS 10.06.961.

[4]     7 Alaska Administrative Code (AAC) 67.230(f); *see also* 7 AAC 50.425(k).

[5]     DEP'T OF FAM. & CMTY. SERVS., OFF. OF CHILD.'S SERVS., CHILD PROTECTION SERVICES (CPS) POLICY MANUAL 6.2.3.1.B (2024).

[6]     *See, e.g.*, AS 47.10.005, .020, .080; *Tessa M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 182 P.3d 1110, 1116 (Alaska 2008).

Columbia had taken legislative action.[7]  I urge the Legislature to consider joining those of our sister states that have restricted their child protection agencies from depriving vulnerable children of these benefits intended to help them overcome extraordinary trauma as they move to adulthood.

---

[7]  *See Recent State Reform Efforts*, CHILDREN'S ADVOCACY INSTITUTE (July 2024), https://www.sandiego.edu/cai/advocacy/youth-benefits/state.php.  Some states have forbidden the state agency from applying to be the child's rep payee unless no other suitable candidate is available.  *See* ARIZ. REV. STAT. § 8-468; CAL. WELF. & INST. CODE § 13756; MD. CODE ANN. FAM. L. § 5-527.1.  Others restrict the use of a child's benefits to payment for unmet needs.  *See* ARIZ. REV. STAT. § 4-468; CAL. WELF. & INST. CODE § 13756; OR. REV. STAT. §§ 409.265, 419B.373.  At least 2 states conserve a percentage of the benefits for the child's future needs.  *See* 20 ILL. COMP. STAT. ANN. 505/5.46; MD. CODE ANN. FAM. L. § 5-527.1.  And Connecticut prohibits its child protection agency from using benefits to offset the cost of a child's care.  CONN. GEN. STAT. § 17a-15d.

PATE, Justice, with whom WINFREE, Senior Justice, joins, dissenting in part.

The court holds that procedural due process obligates OCS to notify foster children in its care of their right to nominate a representative payee for their Social Security benefits. I respectfully disagree with this holding as provided in section IV.B. of the court's opinion. A right to procedural due process can only attach, as the court notes, when there is a deprivation of a "non-trivial protected interest." There is no such interest in this case.

A protectable property interest is created and defined "by existing rules or understandings that stem from an independent source such as state law rules or understandings that secure benefits and that support claims of entitlement to those benefits."[1] While a property interest may exist in an intangible piece of property, such as a license,[2] a contract,[3] or in some cases an entitlement to government benefits,[4] it must in all cases be "defined by existing rules."[5]

For example, we have held that when a statute entitles foster parents to receive foster care payments, procedural due process requires the State to provide notice to those foster parents before reducing or eliminating their benefits.[6] Similarly, other

---

[1]  *Okpik v. City of Barrow*, 230 P.3d 672, 677 (Alaska 2010) (quoting *Breeden v. City of Nome*, 628 P.2d 924, 926 (Alaska 1981)); *id.* (explaining that property interest in benefits requires "claim[] of entitlement to those benefits"). Although the court states that its decision is made under the Alaska Constitution, we use the same test for identifying a property interest as the federal courts. *Hertz v. State, Dep't of Corr.*, 230 P.3d 663, 668 (Alaska 2010).

[2]  *Herscher v. State, Dep't of Com.*, 568 P.2d 996, 1002 (Alaska 1977).

[3]  *City of Homer v. Campbell*, 719 P.2d 683, 684-85 (Alaska 1986).

[4]  *Sockwell v. Maloney*, 431 F. Supp. 1006, 1012 (D. Conn. 1976); *Goldberg v. Kelly*, 397 U.S. 254, 262, 262 n.8 (1970).

[5]  *Okpik*, 230 P.3d at 677.

[6]  *Heitz v. State, Dep't of Health & Soc. Servs.*, 215 P.3d 302, 306-07 (Alaska 2009).

courts have recognized that foster children have a property interest in the continued receipt of foster care benefits, such that the state may not terminate these benefits without due process.[7]

The court acknowledges that OCS's practice "does not attach or reduce the amount of the benefits" that the plaintiffs are entitled to receive. And it acknowledges that the plaintiffs have "no guaranteed right" to the potential additional funds created by the overlap of the two programs. That, in my view, is the end of this case. If the plaintiffs receive everything to which they have "claims of entitlement," they are not being deprived of a protected property interest.[8]

The court locates a property interest in the "intangible rights and privileges that foster children have by virtue of the intersection between their property interests in SSA benefits and the state foster care stipend." Although the court does not precisely define these rights, it asserts that these rights include a "right to know of one's entitlement" and an "ability to understand" the benefits to which one is entitled. These rights are not "individual entitlement[s] grounded in state law."[9]

Property interests must be defined by "existing rules or understandings."[10] No existing rule gives foster children the "right to know of one's entitlement . . . and to nominate a private rep payee" that forms the basis of the court's decision. And no other

---

**7**    *Youakim v. McDonald*, 71 F.3d 1274, 1289 (7th Cir. 1995); *Sockwell*, 431 F. Supp. at 1012; *cf. McGrath v. Weinberger*, 541 F.2d 249, 253 (10th Cir. 1976) (declining to extend this interest beyond cases involving termination of benefits).

**8**    *Okpik*, 230 P.3d at 677 (quoting *Breeden v. City of Nome*, 628 P.2d 924, 926 (Alaska 1981)); *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).

**9**    *City of Homer v. Campbell*, 719 P.2d 683, 684-85 (Alaska 1986) (quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982)).

**10**    *Okpik*, 230 P.3d at 677 (quoting *Breeden*, 628 P.2d at 926).

court has recognized a similar right.[11] Indeed, the court acknowledges that OCS already complies with all relevant statutes and regulations and that OCS's use of the benefits is lawful.[12] The court identifies no statute, regulation or rule, federal or state, that creates the property interest it recognizes.[13]

The court states, "In order to determine whether a government action implicates procedural due process and whether a person has been denied such process, we apply the framework outlined by the United States Supreme Court in *Mathews v. Eldridge*." But the *Mathews* framework addresses only *what* process is due, not

---

[11] The court cites to a string of cases that it characterizes as recognizing "foster children's due process property interests in the context of foster care payments." But none recognize the type of interest the court identifies here. Two cases recognize that foster children have a property interest in the continued receipt of their foster care payments, such that they are entitled to due process if the state seeks to reduce or terminate those payments. *See Sockwell*, 431 F. Supp. at 1008; *Youakim*, 71 F.3d at 1278. The remaining cases cited by the court did not involve due process claims asserted by foster children. *See C.H. v. Payne*, 683 F. Supp. 2d 865, 878 (S.D. Ind. 2010) (recognizing private cause of action enforceable under 42 U.S.C. § 1983); *Kelly ex rel. Kelly v. Heckler*, 740 F.2d 881, 882 (11th Cir. 1984) (per curiam) (holding foster care benefits are "regular contributions" towards support of children under Social Security Act); *Frost v. Weinberger*, 515 F.2d 57, 67 (2d Cir. 1975) (holding due process satisfied when Social Security Administration afforded deceased spouse and legitimate children hearing after reducing their benefits to begin payment to illegitimate children).

[12] *See Wash. State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler* (*Keffeler II*), 537 U.S. 371, 389-91 (2003) (9-0 decision).

[13] There can be no property interest in notice itself. "The categories of substance and procedure are distinct." *Walt v. State*, 751 P.2d 1345, 1349 (Alaska 1988) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985)). For the foster children to be entitled to any particular procedure, they must first identify a legitimate claim of entitlement to some substantive interest. The due process clause does not protect "an entitlement to nothing but procedure." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 764 (2005).

*whether* any process is due in the first instance.[14]  Due process is implicated when (1) there has been a deprivation and (2) the deprivation is of a protected interest.[15]  Here, it appears that the court misuses the *Mathews* factors to determine whether the action implicates procedural due process.  There must first be a deprivation of a protected interest; only then do we balance the *Mathews* factors to decide if the plaintiff was entitled to greater pre-deprivation process.[16]

The court observes that OCS's scheme is "fundamentally unfair" because it allows a state agency to take financial advantage of the benefits system without providing notice to interested parties.  The court's focus on the unfairness resulting from OCS's failure to provide notice appears to reflect a concern for substantive due process rather than procedural due process.[17]  But at the same time, the court's concern for

---

[14]  *See* Erwin Chemerinsky, *Procedural Due Process Claims*, 16 TOURO L. REV. 871, 888 (2000) ("If there is no deprivation of life, liberty, or property, then we do not ever get to the third question in terms of what procedures are required.").

[15]  *See Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993) (stating that procedural due process claims require plaintiff to demonstrate "(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; [and] (3) lack of process"); *Armstrong v. Reynolds*, 22 F.4th 1058, 1070-71 (9th Cir. 2022) (finding protected property interest for whistleblower's right to continued employment without discipline for exercising whistleblowing rights, but failure by plaintiff to assert intentional deprivation of that interest).

[16]  *See* Chemerinsky, *supra* note 14, at 871.

[17]  As we recently reiterated, "[s]ubstantive due process 'focuses on the result of governmental action, not its procedures,' meaning that it 'imposes limits on what a state may do regardless of what procedural protection is provided.' " *Native Vill. of Kwinhagak v. State, Dep't of Health & Soc. Serv.*, 542 P.3d 1099, 1117 (Alaska 2024) (quoting *In re Hospitalization of Mabel B.*, 485 P.3d 1018, 1024 (Alaska 2021)). Substantive due process "is meant to guard against unfair, irrational, or arbitrary state conduct that 'shock[s] the universal sense of justice.' " *Doe v. State, Dep't of Pub. Safety*, 444 P.3d 116, 125 (Alaska 2019).  Here, the court's concern seems to be not about the ward's procedural right to notice itself, but rather the unfairness arising *as a result* of the State's failure to give notice.

fundamental unfairness seems to be internally inconsistent with its rationale that OCS's treatment of the benefits is not so inequitable so as to justify restitution.

The court attempts to limit the scope of its decision, stating the interest it recognizes is "limited to this context." But the court's recognition of a vague and novel property interest, unmoored from any existing entitlement, is a significant departure from existing law without adequate justification. I therefore dissent.